COMMONWEALTH *vs.* GREGORY PICKLES
(and a companion case[1]).

Suffolk.    September 17, 1973. — December 14, 1973.

Present:    TAURO, C.J., REARDON, QUIRICO, BRAUCHER,
& HENNESSEY, JJ.

*Error,* Whether error harmful. *Evidence,* Relevancy and materiality, Cumulative evidence, Judicial discretion, Prior statement of witness corroborating his testimony, On recross-examination, Witness's notes, Contradiction of witness, Opinion.

At a criminal trial, although an answer of a prosecution witness was unresponsive hearsay, it was harmless in view of testimony of another witness. [399]

Commonwealth *vs.* Charles A. McDonald.

At the trial of indictments for murder, where the theory of the Common-
wealth was that two prostitutes and the two defendants joined in a
common enterprise to kill members of a gang, the admission of certain
. evidence showing misconduct by the defendants not related to the issues
in the case was held not to be error where it appeared that some of the
evidence tended to establish the relations of the parties to the common
enterprise, that some of the evidence showed settled ill will and hatred
toward the gang and tended to establish a motive for the murder, that,
although certain evidence was hearsay, it was merely cumulative and its
admission was not prejudicial, and that evidence of the attempted
shooting of one of the gang four days after the murder in question tend-
ed to confirm the continuing common enterprise, the ill will and the
understanding participation of one of the defendants. [399-400]

At a criminal trial, where a witness for the prosecution was, on cross-
examination, asked pointed questions about her "deal" with the prose-
cutor and the jury might have inferred that her testimony was a recent
fabrication, it was proper, on redirect examination, to elicit statements
she had made before talking to the prosecutor which were consistent
with those she made at trial. [400-401]

At the trial of indictments for murder, where it appeared that a prosecu-
tion witness was exhaustively cross-examined by counsel for each
defendant, that, after redirect examination, counsel for one of the
defendants, on further cross-examination, asked her several repetitive
questions on bias, and that, on further redirect examination, she testi-
fied that her testimony was the truth, the judge did not abuse his discre-
tion in refusing to permit further recross-examination. [401]

At a criminal trial, the judge did not abuse his discretion by permitting a
police officer, on direct examination, to read from his notes of a conver-
sation with one of the defendants. [401-402]

At a criminal trial, the judge did not commit error in allowing cross-
examination of a defence witness concerning a prior statement he had
made whose implications tended in a different direction from his testi-
mony, although it did not directly contradict such testimony. [402]

At a criminal trial, there was no error where an answer by a prosecution
witness who had been called to impeach a defence witness was merely an
observation that a denial by the defence witness that he had made a par-
ticular statement was inconsistent with what the prosecution witness
had heard, and did not express an opinion by the prosecution witness
that the purported statement by the defence witness was inconsistent
with the latter's testimony. [402-403]

INDICTMENTS found and returned in the Superior Court on
November 17, 1969.

The cases were tried before *Forte,* J.

*Albert L. Hutton, Jr.* (*Henry E. Quarles* with him) for the
defendants.

*Robert J. Glass,* Special Assistant District Attorney, for
the Commonwealth.

BRAUCHER, J.   After a joint trial, a jury found the defendants, Pickles and McDonald, guilty of murder in the first degree and recommended that the death penalty be not imposed. They were sentenced to life imprisonment and appealed pursuant to G. L. c. 278, §§ 33A-33G. They argue seven points relating to the admission and exclusion of evidence, including claims that evidence of illegal acts by the defendants was improperly admitted and that a police officer was improperly permitted to read from his notes. We affirm both convictions.

We summarize the evidence on behalf of the Commonwealth. The body of Willie "Poison" Gray was found on a roadside in Franklin Park in Boston about 3:30 A.M. on September 30, 1969. He had been shot twice with a .32 caliber semi-automatic pistol. On October 22, 1969, Mildred Perry accidentally fired the same .32 in a taxicab in Boston. She was arrested, and had with her a .38 pistol and a shotgun as well as the .32. Two days later, on October 24, 1969, Markensa "Candy" Martindale was arrested. The Commonwealth's case largely depended on the testimony of Perry and Martindale, who had both pleaded guilty to conspiracy to commit murder.

According to their testimony, each was a prostitute who gave her earnings to Jack "Touch" Banno. Perry first met the defendant McDonald in August or September, 1969, on a trip to court. She told McDonald that Banno had to go to court because she "had called the police on him." McDonald said, "Well, if you are a cop-caller, then you can't ride in my car." About a week later, McDonald told her about meeting Alvin Campbell and Dennis "Deke" Chandler, a member of the Campbell gang, at the "Sugar Shack" in Boston. They told him that "he could not sell dope in Boston unless he went through them. And he told them that he would sell dope to their mother, and that if they would come outside, one by one, he would take care of them."

Banno was stabbed to death on September 25, 1969. A few days earlier Perry, Banno and McDonald were in a car when McDonald shot at Chandler but missed him because Perry

hit his hand. After Banno's death Martindale moved into Perry's apartment. On September 27, 1969, McDonald came to the apartment and he and Perry and Martindale discussed Banno's death. They agreed that Banno had been killed because he was present when McDonald shot at Chandler, talked of how to "get" the Campbell brothers, and discussed the possibility that Gray had killed Banno. Perry said Gray was working with the Campbells.

On September 29, 1969, Martindale and McDonald drove to Lowell. With two men from Lowell named Kitchen and Williams, they drove on to New Hampshire to pick up the defendant Pickles, whom McDonald described as a killer. On the way back they stopped at the house of "Crazy Legs" Jack in Lowell, where McDonald obtained a shotgun. McDonald told Pickles he wanted to kill the Campbells, and Pickles told Martindale he had been dealing dope for McDonald in New York. McDonald, Pickles and Martindale arrived back at Perry's apartment in Boston about 11 P.M.

Perry, Martindale, McDonald and Pickles then rode around Boston looking for the Campbells, Pickles armed with the .32 and McDonald with the shotgun. After looking in various bars without finding any Campbells, they returned to Perry's apartment about twelve or one o'clock. Later, Martindale looked out the window, saw Gray coming in with two men, one of whom lived across the hall, and said, "Here comes Poison [Gray]." McDonald said, "Get him. We'll kill him, too." Perry went across the hall and brought Gray back. The four took him down the stairs to the car and drove to Franklin Park. Pickles shot him and McDonald pushed the body out of the car.

After the shooting McDonald and Pickles lived in Perry's apartment. On October 4, 1969, the four were out riding and saw Chandler, who fled in a car. They chased him and tried to shoot him. McDonald left about the middle of October. Perry gave Pickles $100 and he went home to Florida.

Pickles testified, giving a very different account. Chandler testified that. he did not know Perry, Martindale, or the defendants. Kitchen and Williams contradicted Pickles and

corroborated Perry and Martindale with respect to the New Hampshire trip. A police officer testified to a false alibi and to damaging admissions by Pickles on the way from Florida to Boston. McDonald did not testify.

The defendants were indicted on November 17, 1969. A trial in March, 1970, ended in a mistrial. The trial here in issue was held May 11 to May 21, 1970. A motion for a new trial was denied on January 27, 1972, and a second such motion was denied without prejudice on November 9, 1972.

1. *Custody of the bullets.* The police ballistician was shown two containers for the two bullets removed from Gray's body and clothing and was asked where he got them. He answered that they were received by a named detective from the medical examiner. The answer was unresponsive hearsay, but counsel took an exception instead of moving to strike the answer. See *Commonwealth* v. *McGarty,* 323 Mass. 435, 439 (1948); *Commonwealth* v. *Early,* 349 Mass. 636, 637 (1965). In any event, any error on this point would have been harmless. The medical examiner later testified that he gave the bullets in the containers to the named detective, and it was undisputed that Perry's .32 pistol was the murder weapon.

2. *Misconduct of the defendants.* The defendants assign as error the admission of five items of evidence showing misconduct by them not related to the issues in the case: (a) the "cop-caller" conversation between McDonald and Perry, (b) the conversation between McDonald and the Campbells at the "Sugar Shack," recounted to Perry by McDonald, (c) McDonald's shot at Chandler in September, 1969, (d) Martindale's account of the "Sugar Shack" conversation, overheard by Perry, and (e) the chase of Chandler on October 4, 1969.

"But while evidence of other criminal or wrongful behavior may not be admitted to prove the character or propensity of the accused as enhancing the probability that he committed the offence for which he is standing trial, it is admissible for other relevant probative purposes. . . . If, indeed, the value of the statement as legitimate proof ap-

peared to be substantially outweighed by the danger of prejudice not correctible by the good sense of the jury, a case could be made for excluding it, . . . but the present record does not persuade us to such a conclusion." *Commonwealth* v. *Chalifoux,* 362 Mass. 811, 816 (1973).

The theory of the Commonwealth was that the two prostitutes and the two defendants joined in a common enterprise to kill members of the Campbell gang. The "cop-caller" conversation, although not highly relevant of itself, occurred at the first meeting of the witness Perry and the defendant McDonald; together with McDonald's account of his meeting with Campbell and Chandler and the subsequent assaults on Chandler, it tended to establish the relations of the parties to the common enterprise. *Commonwealth* v. *Beal,* 314 Mass. 210, 227 (1943). Whether or not Gray and Chandler were in fact associated with the Campbells, it appeared that the defendants believed them to be, and the showing of settled ill will and hatred toward the Campbell gang tended to establish a motive for the murder. *Commonwealth* v. *Ramey,* 243 Mass. 394, 396 (1923). *Commonwealth* v. *Simpson,* 300 Mass. 45, 56 (1938).

Perry's testimony to Martindale's account of the "Sugar Shack" conversation was hearsay. But Perry herself had testified to McDonald's account of the same conversation. The second account was merely cumulative and its admission was not prejudicial. *Commonwealth* v. *Palladino,* 346 Mass. 720, 722-723 (1964).

The attempted shooting of Chandler on October 4, 1969, four days after the murder of Gray, is less clearly material than the prior events. But it tends to confirm the continuing common enterprise, the ill will, and, particularly, the understanding participation of Pickles. We think the remoteness of the incident was a matter for the discretion of the judge. *Commonwealth* v. *Ramey,* 243 Mass. 394, 397 (1923). *Commonwealth* v. *Simpson,* 300 Mass. 45, 50 (1938).

3. *Prior consistent statement.* The witness Martindale testified on redirect examination that she had told the same story to the police on October 24, 1969, that she told at the

trial. The defendants claim error, citing *Wilson* v. *Jeffrey,* 328 Mass. 192, 194 (1951). We need not consider whether the evidence was admissible because the defendants had cross-examined Martindale about the same conversation with the police. Compare *Commonwealth* v. *Douglas,* 354 Mass. 212, 225 (1968), with *Commonwealth* v. *Taylor,* 327 Mass. 641, 650-651 (1951). The witness had been asked pointed questions about her "deal" with the prosecutor, and the jury might have inferred that her testimony was a recent fabrication. It was therefore proper to show consistent statements made before she talked to the prosecutor. *Commonwealth* v. *Giacommazza,* 311 Mass. 456, 469 (1942). Cf. *Boutillette* v. *Robbins,* 338 Mass. 195, 197-198 (1958). See *Commonwealth* v. *Carroll,* 360 Mass. 580, 587-589 (1971).

4. *Denial of recross-examination.* The witness Martindale was exhaustively cross-examined by counsel for each of the defendants. After redirect examination by the Commonwealth, counsel for the defendant McDonald on further cross-examination asked her several repetitive questions on bias (e.g., ". . . would you lie to save your life?"). On further redirect examination, she testified that her testimony was the truth, that she was never threatened with death, and that there was no necessity for her to tell any lies in this case. The judge then refused to permit further recross-examination. Contrary to the defendants' contention, there was no abuse of discretion. *Commonwealth* v. *D'Agostino,* 344 Mass. 276, 278 (1962). *Commonwealth* v. *Gordon,* 356 Mass. 598, 602 (1970).

5. *Reading of notes.* A police officer was permitted on direct examination to read from his notes of a conversation with the defendant Pickles. First the judge said, "You may look at your notes and refresh your recollection." Then, after the officer testified in response to questions by the judge that he had made the notes when he returned that night, while his memory was fresh, the judge said, "Now, you may read from the notes." The officer then answered questions by reading from the notes.

The defendants contend that this procedure was improper

for "present recollection revived," since a writing used to refresh recollection may not be read to the jury. See *Bendett* v. *Bendett,* 315 Mass. 59, 63 (1943); *Fisher* v. *Swartz,* 333 Mass. 265, 267 (1955). Therefore, they argue, the evidence must have been admitted as "past recollection recorded," and there was error since the witness did not explicitly testify that the notes gave a true and correct account. See *Gurley* v. *Springfield St. Ry.* 206 Mass. 534, 538 (1910); *Guiffre* v. *Carapezza,* 298 Mass. 458, 459 (1937). We disagree.

The judge was not required to distinguish between "present recollection revived" and "past recollection recorded" unless there was some difference in legal consequence. Whether or not the notes created a present recollection by the officer, the judge in his discretion could permit him to incorporate them in his testimony. *Commonwealth* v. *Dougherty,* 343 Mass. 299, 306 (1961). The writing itself was not put in evidence, and we need not decide whether a further foundation should have been laid if it had been.

6. *Prior inconsistent statements.* After Chandler testified for the defendants that he did not know the defendant McDonald, the prosecutor was permitted to ask him on cross-examination about a conversation with a Federal narcotics agent. It was suggested that the agent observed bullet holes in Chandler's car and asked whether they were from the night McDonald shot at him and that Chandler answered, "Oh, you know about that?" Chandler denied making the statement, and a Commonwealth witness later testified to it.

The defendants claim that the statement was not inconsistent with Chandler's trial testimony. Without his knowing McDonald, it is argued, he might have heard the story from another source. But a "prior inconsistent statement" need not directly contradict the testimony of the witness. It is enough if its implications tend in a different direction. *Langan* v. *Pianowski,* 307 Mass. 149, 151 (1940). *Commonwealth* v. *West,* 312 Mass. 438, 440 (1942). That test was met.

7. *Opinion on inconsistency.* The Commonwealth witness

called to impeach Chandler was asked on recross-examination whether he was present for the sole purpose of contradicting Chandler. The judge interjected, "If the testimony was inconsistent with what you thought to be the truth." The defendant McDonald argues that the judge thereby permitted the witness to express his opinion that Chandler's pretrial statement was inconsistent with his testimony that he did not know McDonald. We read the testimony differently. The witness was saying that Chandler's denial that he had made the statement was inconsistent with what the witness heard. The witness said, in response to a question by the judge, "I know what I heard."

8. We have carefully reviewed the evidence both at trial and on the first motion for a new trial, as required by G. L. c. 78, § 33E, as amended. It was open to the jury to return the verdicts which they did, and justice does not require the entry of verdicts of a lesser degree of guilt or that there be a new trial.

*Judgments affirmed.*