STATE of Missouri, Respondent,

v.

Robert Scott MARTIN, Appellant.

No. 13054.

Missouri Court of Appeals,
Southern District,
Division Four.

April 26, 1983.

Motion for Rehearing or to Transfer
Denied May 13, 1983.

Application to Transfer Denied
June 30, 1983.

646

Loren R. Honecker, Sherwood, Honecker & Bender, Springfield, Gary C. Riley, Shafer, Gilliland, Davis, McCollum & Ashley, Odessa, Tex., for appellant.

John Ashcroft, Atty. Gen., John Morris, Asst. Atty. Gen., Jefferson City, for respondent.

FLANIGAN, Judge.

A jury found defendant Robert Scott Martin guilty of the offense of capital murder, § 565.001,[1] and he was sentenced to imprisonment for life without eligibility for probation or parole for 50 years. The victim was Vesta Martin, defendant's stepmother. Mrs. Martin was fatally shot in her home near Waynesville by James Murphy at approximately 11 p.m. on May 15, 1981. The state's evidence showed that Murphy, who admitted the killing, did so pursuant to a "contract" between Murphy and Ron Wood, and that Wood, in hiring Murphy to do the killing for $10,000, did so at the direction of defendant and with money provided by defendant. Defendant appeals.

Defendant's first point is that the trial court erred in receiving into evidence, over defendant's objection, testimony concerning "the purported contemplated theft" of a Mercedes automobile "involving defendant, Murphy and Wood" because such evidence was irrelevant and constituted evidence of "other crimes" whose prejudicial effect outweighed its probative value.

Most of the challenged evidence involving the Mercedes was elicited from state's witnesses Wood and Murphy.[2] The Mercedes conversation took place "near the end of April," 1981, apparently on April 30 or May 1, at an auto salvage yard in Lebanon. Before that challenged conversation is described it is necessary to set forth some antecedent events.

Mrs. Martin's husband, defendant's father, died in 1980 and he left her an estate of approximately half a million dollars. Defendant, who was experiencing financial difficulties, knew that the will of Mrs. Martin provided that upon her death defendant would receive ⅓ of her estate and the other ⅔ would go to defendant as trustee for his two sons.

In March 1981 defendant became a close associate of Ronald Wood. Defendant knew that Wood had a criminal record which included a conviction for attempted murder. Defendant told Wood that he was having trouble with his stepmother over some money which he felt rightly belonged to him. Defendant complained that Mrs. Martin refused to sell some commercial real estate which he felt should be sold. In mid-April defendant asked Wood if he could find someone to murder Mrs. Martin and Wood agreed to do so.

Pursuant to defendant's request Wood contacted one Wagoner and asked if he was interested in committing a "contract murder." Wagoner was unreceptive but Wood asked him if James Murphy, an ex-convict, would do the act. Wood had known Murphy for several years. Wagoner said he would contact Murphy and did so.

On some date prior to the Mercedes conversation defendant was in Springfield with a business associate when the latter was having dealings with the Mercedes owner. Defendant saw the Mercedes owner take some money out of two bank bags which were in the trunk. Later defendant told Wood that the trunk contained "around

---

1. All references to statutes are to RSMo 1978, V.A.M.S. and all references to rules are to Missouri Rules of Court, V.A.M.R.

2. Wood testified that there were no charges pending against him arising out of the murder of Mrs. Martin or the burglary of her house and that "the officers" had told him "there would be no charges filed on me." Murphy testified that he had agreed with the prosecutor "to plead to capital murder of Mrs. Martin" and "that the prosecutor would ask the judge to waive the death penalty."

$80,000." Wood and defendant "decided to get somebody to rip off the Mercedes and get the money." On the day prior to the salvage yard conversation Wood telephoned Murphy and made arrangements to meet him in the salvage yard the next day.

Defendant and Wood went to the salvage yard and defendant was introduced to Murphy. The three men talked about "ripping off" the Mercedes. This was their first topic of conversation. Defendant told Murphy he would pay him $1,000 to steal the car. This conversation was held in the back portion of the salvage yard. While the three men were walking toward the front, Wood asked Murphy "if Wagoner had asked Murphy if he wanted to do something," and Murphy said he had talked to Wagoner. According to Wood, Murphy did not want to "talk in front of" defendant because "the car deal was not a big deal but the murder was a big deal." Pursuant to Murphy's suggestion, Wood and Murphy withdrew 50 or 100 feet away from defendant and proceeded to discuss the contract killing. Wood told Murphy that the victim was a woman and not a man as Wagoner had previously informed Murphy. Wood told Murphy that Murphy would receive $10,000 for the killing but Murphy "did not give [Wood] a definite answer that day." Defendant and Wood then left the salvage yard and Wood told defendant about the Wood-Murphy conversation.

Later Murphy agreed to do the contract killing and Wood, with money provided by defendant, paid Murphy $500 a few hours before the killing. After the murder Wood, using $4,500 provided by defendant, paid Murphy $4,500. The balance of $5,000, which Murphy was to be paid in 30 days, was never paid.

Testifying in his own behalf, defendant denied complicity in the contract killing and claimed that the money given by him to Wood, and in turn delivered to Murphy, was a part of an innocent business transaction between defendant and Wood. Defendant admitted that he was present when Wood and Murphy discussed the theft of the Mercedes but defendant said, "I knew what the discussion was going to be about and I told them I really did not want to be involved in that."

Two conversations, minutes apart, took place at the salvage yard. Defendant was a participant in the first conversation but not in the second. Defendant does not challenge the admissibility of the conversation between Wood and Murphy in which he did not participate. His position is that the Wood-Murphy-defendant conversation, dealing with the Mercedes, was inadmissible because it constituted evidence of "the irrelevant 'other crime' of conspiring to steal an automobile."[3]

"A criminal defendant has the right to be tried only for the crime or crimes with which he is charged.... The admission of evidence of offenses unrelated to the cause on trial breaches that right because it may result in a conviction founded upon crimes of which the defendant is not accused. Thus, the long-established general rule is that proof of the commission of separate and distinct crimes is inadmissible unless it has some legitimate tendency to establish that the defendant is guilty of the crime with which he is charged.... Specifically, such evidence is admissible to prove the crime charged when it tends to establish motive, intent, the absence of mistake or

**3.** Upon leaving the salvage yard defendant and Wood went to Springfield "to find the Mercedes" and a day or two later those two men again went to Springfield "to look for the Mercedes." "Nothing more occurred in Springfield."

Although Wood gave the testimony set forth in the preceding paragraph, there was no objection to that testimony and it is not mentioned in defendant's brief on appeal. In the absence of that testimony, the question might well arise as to whether the Mercedes conversation, standing alone, constituted "another crime." Sec. 564.011, dealing with an attempt to commit an offense, requires the doing of an act "which is a substantial step toward the commission of the offense." Sec. 564.016, par. 4, dealing with conspiracy, requires proof of "an overt act in pursuance of such conspiracy," by the defendant or a co-conspirator. Although defendant may have inaccurately characterized the challenged conversation, he has properly preserved the issue of its relevancy.

accident, *a common scheme or plan embracing the commission of two or more crimes so related that proof of one tends to establish the other,* or the identity of the person charged with the commission of the crime on trial." (Emphasis added.) *State v. Shaw,* 636 S.W.2d 667, 671–72[4] (Mo. banc 1982).

The excellent briefs of the parties discuss the various exceptions to the general rule and, predictably, take opposing views on their applicability. Defendant claims that the exceptions regarding motive, intent, the absence of mistake or accident, and identity, do not support the admissibility of the challenged evidence and the state argues otherwise. The merits of the foregoing arguments need not be considered because this court holds that the evidence was admissible for the reason, also briefed by the parties, that it qualifies under the "common scheme or plan" exception and that the trial court did not abuse its discretion in receiving it.

"Where there is a conspiracy between two or more parties, formed for the purpose of committing crime, and several crimes are committed in pursuance of the general plan, such crimes are so related to each other that the proof of one tends to prove the other, and, on the trial of a defendant for the commission of one, the others may be shown." *State v. Kolafa,* 291 Mo. 340, 236 S.W. 302, 304 (1922).

In *Kolafa* defendant was convicted of stealing a Ford automobile. The offense took place on September 8, 1917. The state's evidence showed that two other men, Ehrenberg and Biehlich, were defendant's accomplices. The state introduced evidence that two other vehicles were stolen by the three men, one of which was stolen on November 23, 1917. Biehlich testified that the three men had agreed to steal three cars, one for each conspirator. The court pointed out that it was not necessary to allege a conspiracy to commit the crime in order to prove that it was committed in pursuance of a conspiracy. Although the conspiracy was not the crime charged, it was an incident to it and the means by which it was accomplished. The court said the jury had the right to consider the evidence of the other two thefts as tending, in connection with other evidence, to show the commission of the crime charged. The court said, at p. 305, "Evidence of crimes other than those charged, committed by the same parties, is admissible for the purpose of proving a conspiracy or a common scheme."

In *State v. Meller,* 382 S.W.2d 671 (Mo. 1964), the defendant was convicted of stealing a steer. The offense took place on March 17, 1963, and involved two accomplices, Fenton and Steinmetz. The state introduced evidence that the same felonious trio stole a cow and calf on February 23 and eight hogs on February 25. The court held that the testimony of the accomplices "relating to offenses close in point of time, when coupled with the testimony of both Fenton and Steinmetz concerning the initial meeting at which it was agreed that if they would steal cattle, he, defendant, would show then how to sell them, was admissible ... to show knowledge, intent or design in the commission of the offense charged for which the defendant was on trial.... All of these acts to which Fenton and Steinmetz testified tended to show that defendant and his accomplices did in fact carry out their previous agreement to commit acts of theft and bore upon the commission of the theft actually charged." See also *State v. Harrison,* 285 S.W. 83, 86[8] (Mo.1926); *State v. Strait,* 279 S.W. 109, 114[10] (Mo. 1925); and *State v. Carroll,* 288 Mo. 392, 232 S.W. 699, 702[3] (1921).

Neither side has cited any case which is factually similar. Here the state's evidence, primarily based on the testimony of Wood, showed a desire, originating with defendant, that Mrs. Martin be murdered. The first step in the implementation of that desire was defendant's request to Wood that Wood find a killer. Pursuant to that request Wood made arrangements to meet Murphy. Defendant accompanied Wood to the salvage yard where Wood first asked Murphy if he would do the act. Defendant, although out of earshot of that conversa-

tion, was a participant in the one which preceded it by a few moments. During the first conversation, the first topic was the contemplated theft of the Mercedes and the question posed by defendant to Murphy, whom he had met only a minute or two earlier, was whether Murphy would commit that crime.

Following those two conversations, and leading up to the killing by Murphy on May 15, there were additional developments demonstrating a common purpose of all three men to cause the murder of Mrs. Martin. Although those developments are links of the same chain, each link, standing alone, involved only defendant and Wood on the one hand, or Wood and Murphy on the other. These are the links:

May 4—Wood drove to Murphy's home and talked to Murphy about the Mercedes theft and the murder. Murphy said he had not yet made up his mind on either matter.

May 8—Murphy met Wood at a tavern and told Wood he would do the killing. Wood told Murphy the killing would be set up for "next week" and Murphy would receive $5,000 in advance of the murder and $5,000 later.

May 12—Defendant showed Wood through Mrs. Martin's house in her absence. Defendant showed Wood the location of Mrs. Martin's pistol in her closet. This was the murder weapon. Later the same day defendant and Wood went to a bank in Crocker where defendant obtained $5,000 in $100 bills. Defendant gave Wood this money, together with keys to Mrs. Martin's house. Defendant, who lived next door to Mrs. Martin, had his own set of keys to her house.

May 13—Wood met Murphy at Witmor Farm. Wood gave Murphy a description of the victim's house and the two men drove by the house. Murphy asked for $500 in advance. Wood telephoned defendant, relayed that request and, with defendant's approval, paid Murphy $500.

May 14—Wood had duplicates made of the victim's house keys and returned the original keys to defendant.

May 15—Defendant assisted Wood in buying a house trailer by co-signing a note with Wood at the bank in Crocker. Mrs. Martin told defendant she was going out to dinner with Ann Adams. Defendant relayed this information to Wood. Later, in the early evening, Wood met Murphy at Witmor Farm, gave Murphy the duplicate keys and told Murphy the killing was set for that night. Wood agreed with Murphy to meet him the next morning and pay him $4,500. Using the keys to obtain entry to the victim's house at about 9:00 p.m., Murphy awaited her arrival. Murphy murdered Mrs. Martin about 11:00 p.m. and stole her Volkswagen, two rings, and other jewelry.

May 16—5 a.m.—Murphy, followed by his wife in another vehicle, drove the Volkswagen to a rural area and burned it, then went with his wife to the salvage yard where Murphy met Wood and gave him Mrs. Martin's rings and two spent shell casings as proof of the murder. Wood paid Murphy $4,500 previously given him by defendant.

May 18—Wood was arrested.

May 20—Murphy and his wife were arrested; in Murphy's home and car were found the victim's jewelry, the murder weapon and the duplicate keys.

May 20—Defendant was arrested.

■ The state's evidence was sufficient to support the conviction and defendant does not claim otherwise. It is equally clear that if the contents of the Mercedes conversation had been excluded, the state's case would still have been sufficient. Evidence otherwise admissible, however, is not rendered inadmissible merely because it is not indispensable to the state's case.

■ If proof of the commission of a separate and distinct crime by defendant is logically pertinent in that it reasonably tends to prove a material fact in issue in the current prosecution, it is not to be rejected merely because it incidentally proves defendant guilty of another crime. *State v. Bellew,* 612 S.W.2d 401 (Mo.App.1981). Proof of another crime is permitted if the other crime is so linked together in time

and circumstances with the crime charged that one cannot be fully shown without proving the other. *State v. King,* 588 S.W.2d 147 (Mo.App.1979). The rule excluding evidence of other crimes does not apply if the independent crime tends directly to prove defendant's guilt of the crime with which he is charged. *State v. Fisher,* 302 S.W.2d 902 (Mo.1957).

The Mercedes conversation took place during the only meeting of defendant, Wood and Murphy prior to the killing. The other links in the chain were defendant-Wood or Wood-Murphy episodes. The respective testimonies of defendant and Wood clashed with regard to the nature of the defendant-Wood links, defendant painting them with the brush of innocence and Wood ascribing to them conspiratorial murderous intent.

Defendant admitted his association with Wood and his knowledge of Wood's criminal background. Defendant denied giving Wood the keys to the victim's house and speculated that Wood stole them from him. Defendant denied giving Wood a tour of the victim's house. Defendant, however, conceded that he gave Wood $5,000 in $100 bills, perhaps because the records of the bank in Crocker tended strongly to support Wood on the fact of that payment.

■ The contemplated theft of the Mercedes and the consummated murder have common traits. Each was initially conceived by defendant; each involved the cooperative efforts of defendant, Wood and Murphy; each involved preparatory work by defendant and Wood; each was to be consummated by Murphy; each had the common objective of obtaining money; and each was to be accomplished in May 1981.

Were the defendant-Wood financial dealings of May 12 and May 15 mere unstained business transactions, as defendant claims, or were they damning steps in the accomplishment of a murderous conspiracy which culminated in the dastardly act of Murphy? Would not the contents of the defendant-Wood-Murphy conversation—the only such conversation, one preceding the murder by only two weeks—aid the jury in resolving the clash? Wouldn't the text of the Mercedes conversation tend "to prove the existence of a larger continuing plan, scheme or conspiracy, of which the present crime on trial is a part?" McCormick on Evidence (2nd Ed.) § 190, p. 448. If so, the evidence was admissible and this court so holds.

■ The admissibility of evidence of other crimes to establish a larger scheme or transaction rests in considerable measure on a determination whether its probative effect is outweighed by its inevitable prejudicial impact upon the defendant. This is the focus of the discussion of such evidence in recent texts. See, generally, Weinstein's Evidence, Vol. 2, § 404[08], [16], [18]. See also Rule 404, Federal Rules of Evidence. This balance must be struck initially by the trial court, which has an opportunity to observe the trial. The trial court ruled the issue against the defendant. In light of the whole record this court will not disturb that discretionary ruling.

In addition to the Missouri cases previously cited, outstate authorities lending support to this court's ruling include *Hardy v. State,* 51 Ala.App. 489, 286 So.2d 899 (Ala.Cr.App.1973); *Commonwealth v. Pickles,* 364 Mass. 395, 305 N.E.2d 107 (Mass. 1973); *State v. Flonnory,* 31 Ohio St.2d 124, 285 N.E.2d 726 (Ohio 1972); *People v. Arnold,* 199 Cal. 471, 250 P. 168 (Ca.1926); and *Davis v. State,* 31 Okl.Cr. 109, 237 P. 471 (Okl.Cr.App.1925). See also 22A C.J.S. Crim.Law § 688, pp. 782, 785; 29 Am.Jur.2d Evid. § 326, p. 376.

Defendant's first point has no merit.

Defendant's second point is that the trial court erred in admitting, over defendant's objection, testimony of state's rebuttal witness Ann Adams concerning a statement which the murder victim, Vesta Martin, made to the witness about four weeks before the murder. The statement attributed to the victim was "Ann, Bob Scott [defendant] might kill me sometime, he has everything to gain if I am not around any more." The rebuttal testimony of Ann Adams was very brief. At its conclusion the trial court

gave an instruction, set out marginally,[4] to limit its effect.

"[S]pecific objections are required to evidence ... and the objection must call the attention of the Court to the ground or reason for the objection.... Such an objection as 'we object' does not preserve any question for review. The trial court must be given an opportunity to rule upon an objection giving stated reasons for exclusion. And the point raised upon appeal must be based upon the theory of the objection as made at the trial." *State v. Lang,* 515 S.W.2d 507, 511 (Mo.1974).

In a motion filed prior to the trial, and several times during the trial, defendant made a general objection to "all statements made by Mrs. Martin outside the presence of defendant which related to her relationship to the defendant." No ground for the objection was stated. In defendant's motion for new trial he for the first time stated a ground for his objection and that ground was hearsay. The brief of defendant's appellate counsel, who did not represent him in the trial court, challenges the admissibility of evidence on the grounds of hearsay and irrelevancy.

■■■ The ground of irrelevancy was not presented to the trial court and has not been preserved for appellate review. *State v. Wells,* 585 S.W.2d 267, 269[7] (Mo.App. 1979). The ground of hearsay, not stated at the time the evidence was offered, was not timely presented to the trial court and it too was not preserved for appellate review. *State v. Franco,* 544 S.W.2d 533, 537[7] (Mo. banc 1976); *State v. Barker,* 572 S.W.2d 185, 187[5] (Mo.App.1978). Under Rule 30.-20 this court, exercising its discretion, will review defendant's second point to determine whether the admission of the testimony constituted plain error affecting substantial rights and resulted in manifest injustice or miscarriage of justice.

Defense witness Jim Bales testified that about two or four weeks before Mrs. Martin's death she told the witness "that when she dies that Dale Martin [defendant's half brother] is not going to get anything, that everything is going to go to [defendant] and the boys." The witness also testified, "I know that Vesta thought a lot of Bob; she has told me this; it was a close relationship." Other defense witnesses testified that the relationship between Mrs. Martin and defendant was "good," "very close," "very good, very loving" and that "she loved defendant like a son."

"Declarations of decedent demonstrating her state of mind, where relevant, are admissible. *State v. Singh,* 586 S.W.2d 410 (Mo.App.1979); see generally *State v. Harris,* 620 S.W.2d 349 (Mo. banc 1981)." *State v. Ford,* 639 S.W.2d 573, 574 (Mo.1982). This court does not rule whether the challenged testimony of Ann Adams would have been admissible if it had been offered as a part of the state's case in chief. See *United States v. Brown,* 490 F.2d 758 (D.C. Cir.1973); cf. *Sallee v. State,* 544 P.2d 902, 906–907 (Ok.Cr.App.1975). The challenged statement does not contain a specific "narration of past acts or conduct of the defendant." If it did, "the greater the danger of jury misuse." *United States v. Brown,* supra, p. 775. Defendant's attack upon the testimony is based primarily on the ground of irrelevancy rather than on the ground of hearsay because defendant concedes, at least tacitly, that the statement might constitute evidence of the state of mind of the victim.

■■■ The scope of rebuttal testimony rests within the broad discretion of the trial court and the appellate court will not interfere in the absence of an abuse of that

4. "Members of the jury, I believe it's my duty, as a Judge, to tell you that the testimony of Mrs. Adams concerning the statement of Mrs. Vesta Martin that she was afraid her step-son, Robert Scott Martin, would kill her, is not to be taken for the truth that Robert Scott Martin killed her or had anything to do with the killing of her. I have admitted it for two reasons. Number one, to show the state of mind of Vesta Martin as to her relationship with her step-son, Robert Scott Martin; and for the second reason, as rebuttal evidence to witnesses who testified as to their observation of the close relationship between Vesta Martin and her son, Robert Scott Martin."

discretion. *State v. Crain,* 638 S.W.2d 761, 762 (Mo.App.1982). Any competent testimony which tends to explain, counteract, repel or disprove evidence offered by defendant may be offered in rebuttal of defendant's evidence. *State v. Dizdar,* 622 S.W.2d 300, 302[1] (Mo.App.1981). Considering the content of the statement, the fact that it was rebuttal testimony, the nature of the defense evidence which it was intended to rebut, the content and timing of the limiting instruction, and this court's review of the entire record, this court holds that the admission of the challenged testimony did not constitute "plain error." Defendant's second point has no merit.[5]

Defendant's third point is that the trial court erred in giving Instruction 7, the state's verdict-directing instruction on capital murder, set out marginally.[6] Defendant makes two attacks on the instruction.

Defendant's first criticism of the instruction is that it "failed to require a finding of the necessary intent on the part of the actual perpetrators of the offense." Defendant also says that the instruction "fails to find the necessary elements attributable to the principal actor [Murphy]." Defendant's motion for new trial, in challenging the instruction, complained that "the first paragraph should have related to the acts and conduct of the active participants, including their intent."

As this court construes the foregoing criticism of the instruction, defendant appears to be saying that the instruction should have required the jury to find that Murphy intended to take the life of Vesta Martin, that Murphy knew that he was practically certain to cause the death of Vesta Martin, and that Murphy considered taking the life of Vesta Martin and reflected upon this matter coolly and fully before doing so and that the instruction is erroneous in requiring the jury to find those things with respect to the mind of defendant rather than the mind of Murphy. Defendant does not challenge the sufficiency of the evidence to support Instruction 7.

"A person with the required culpable mental state is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is criminally responsible, or both." § 562.036. "A person is criminally responsible for the conduct of another when ... (2) Either before or during the commission of an offense with the purpose of promoting the commission of an offense, he aids or agrees to aid or attempts to aid such person in planning, committing or attempting to commit the offense." § 562.041, par. 1. "Except as otherwise provided, when two or

---

**5.** Although defendant's brief claims that the trial court erred in admitting other testimony of Ann Adams and testimony of Virginia Tryan concerning statements made to them respectively by the victim about the latter's intention to change her will, defendant's motion for new trial did not allege error with regard to that testimony and such error has not been preserved for appellate review. Rule 29.11(d). A gratuitous examination of that testimony shows that it was properly admitted in rebuttal of the testimony of defense witness William Morgan, an attorney, who testified that Mrs. Martin had told the witness, sometime after the death of her husband, that she wanted to make no changes in her will.

**6.** "INSTRUCTION NO. 7

If you find and believe from the evidence beyond a reasonable doubt:
First, that on or about May 15, 1981, in the County of Pulaski, State of Missouri, certain persons with the aid of defendant committed the offense of capital murder, in that

Such persons caused the death of Vesta Martin by shooting her, and that
The defendant intended to take the life of Vesta Martin, and that
The defendant knew that he was practically certain to cause the death of Vesta Martin, and that
The defendant considered taking the life of Vesta Martin and reflected upon this matter coolly and fully before doing so, and
Second, that the defendant, either before or during the commission of the offense of capital murder with the purpose of promoting its commission, aided such persons in planning that offense,
then you will find the defendant guilty of capital murder.
However, if you do not find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense."

more persons are criminally responsible for an offense which is divided into degrees, each person is guilty of such degree as is compatible with his *own culpable mental state* and with his own accountability for an aggravating or mitigating fact or circumstance." § 562.051. (Emphasis added.)

"Any person who unlawfully, willfully, knowingly, deliberately, and with premeditation kills or causes the killing of another human being is guilty of the offense of capital murder." § 565.001.

In Note 2 in the Notes on Use to MAI–CR2d 15.02 it is pointed out that § 565.001 covers both "kills" and "causes the killing." An example of the latter, says that note, is "hiring a third person to commit the murder." It may well be, which need not be decided, that MAI–CR2d 15.02 could have been utilized in the present case, with paragraph First of the instruction requiring a finding that Vesta Martin's death was caused by defendant's hiring of Murphy to shoot her. It should be noted that MAI–CR2d 15.02, in paragraphs Second, Third and Fourth, makes mention of the mental state of the defendant and only the defendant.

Combining MAI–CR2d 15.02 and MAI–CR2d 2.12 into one instruction, which is the situation with respect to Instruction 7, has been approved where the evidence supports an instruction on capital murder and a finding that defendant had acted with another. *State v. Robinson,* 641 S.W.2d 423, 425[1] (Mo. banc 1982). Defendant does not claim that the state, under the instant facts, was restricted to the use of MAI–CR2d 15.02 alone.

Defendant does not claim that the facts would not support the giving of an instruction or instructions predicating Martin's guilt upon his role as an accomplice. His complaint is that Instruction 7 improperly submitted defendant's state of mind rather than Murphy's state of mind. There is no merit in this contention.

An instruction containing the criticized feature of Instruction 7 was given and approved in *State v. Williams,* 611 S.W.2d 26 (Mo. banc 1981). The instruction is set out

in footnote 3 on p. 29. It is true that the instruction in *Williams* was not specifically attacked on the instant ground but it is also true that the court found no error in it.

In *State v. White,* 622 S.W.2d 939 (Mo. banc 1981), defendant White was found guilty of capital murder of Susie Hawkins. The actual shooting was done by Hardy Bivens. The date of the offense was February 5, 1979, which was after the effective date [January 1, 1979] of §§ 562.036, 562.-041.1 and 562.051.

In *White,* as in the case at bar, in addition to the verdict-directing instruction the court also gave MAI–CR2d 2.10 and MAI–CR2d 2.14. The verdict-directing instruction in *White,* in essence, required the jury to find that *Bivens,* with the aid of defendant, knew he was practically certain to cause the death of the victim, and that *Bivens,* with defendant's aid, considered taking the life of the victim and reflected upon the matter coolly and fully before doing so. The instruction also required the jury to find that defendant aided Bivens in committing the offense of capital murder with the purpose of promoting its commission. One of the complaints made by defendant with regard to the verdict-director in *White* was that it *failed* "to require the jury to find that *defendant* had the intent of the underlying felony." The court upheld the instruction in light of § 562.036, § 562.041.1(2) and § 562.051.

In a dissenting opinion Judge Seiler criticized the verdict-director as being improper. At p. 950 Judge Seiler said:

"After calling for a finding that Bivens, with the aid of defendant, caused the death of Susie Hawkins by shooting her, the instruction continues 'in that Hardy Bivens, with the aid or attempted aid of the defendant intended to take the life of Susie Hawkins.' Does this mean that defendant somehow aided Bivens in Bivens forming an intent to kill the victim? If so, where is the supporting evidence? Or does it mean that Bivens intended to take the victim's life with defendant's help? *If it means this, where is there any requirement that the*

jury find what the defendant's intent was? What Bivens may have intended is not binding on defendant." (Emphasis added.)

In footnote 3 on p. 951 Judge Seiler set forth what he regarded as a "clear and legally accurate instruction." That instruction, in effect, has the format of Instruction 7 in the case at bar. This court is not saying that it is following Judge Seiler's dissent rather than the holding of the principal opinion in *White.* What this court is saying is that the instant instruction would have satisfied both the majority in *White* and Judge Seiler.

In *State v. Betts,* 646 S.W.2d 94 (Mo. banc 1983), a defendant was convicted of capital murder committed during the burglary of the victim's house. Defendant testified that his accomplice Brooks did the shooting, and Brooks testified that defendant did the shooting. Instruction 8, set out at p. 96, required the jury to find, among other things, that "defendant or another intended to take the life of [the victim]," and that "defendant or another knew that he was practically certain to cause the death of [the victim]," and that "defendant or another considered taking the life of [the victim] and reflected upon this matter coolly and fully before doing so." The court said that the verdict-director, which it approved, followed the pattern given and approved in *White.*

It should be noted that the instruction in *Betts* is less favorable to the defendant there than Instruction 7 is to the instant defendant. Here the jury was required to find the mental state was that of Martin and no one else. It was not given the option of finding the mental state of Martin or Murphy, coupled with the additional requirements of aiding and abetting.

In *State v. Murray,* 630 S.W.2d 577 (Mo. banc 1982), the evidence supported submission of defendant's guilt as an active participant or "as an aider in a manner less than an active participant." The instruction which was given required the jury to find that defendant was an active participant. Upholding the instruction, the court said that "by narrowing the bases for convic-

tion," the giving of the instruction "operated to [defendant's] advantage, not his prejudice, and at most was harmless error . . . and not a ground for reversal."

In Note 7 to Notes on Use to MAI–CR2d 2.12, which was printed in February 1983, after the instant trial, there is a discussion of "special problems when using MAI–CR2d 2.12 to submit Capital Murder." With respect to the element of deliberation, that note says, "If in using MAI–CR2d 2.12, this element is ascribed to the defendant alone, or to the defendant *and* the other person or persons, the requirement of finding that the defendant 'deliberated' is satisfied." That statement points up the controlling significance of the intent of the *defendant.* The note proceeds to discuss *White* and suggests a modification where the element of deliberation is not ascribed to the defendant but is ascribed *solely* to another person "as would be the case" where defendant's liability is based solely on his aiding the actual killer. A proposed modification is set forth but the note states that the failure to utilize it, in light of the holding in *White,* is not necessarily reversible error. The proposed modification would require the jury to find, among other things, "that with the purpose of promoting or furthering the death of [name of victim], the *defendant* aided or encouraged [the killer] in causing the death of [the victim] and reflected upon this matter coolly and fully." This is a plain reference to defendant's own intent.

Defendant's first criticism of Instruction 7 is invalid.

■ Defendant's second criticism of Instruction 7 is directed to this portion: "Then you *will* find the defendant guilty of capital murder." Defendant claims that "may" should have been substituted for "will." The foregoing criticism has no validity, as a ground of prejudicial error, for the reasons stated in *State v. Betts,* supra, 646 S.W.2d 94, 97[3]. The same criticism was made in *White,* as discussed in *Betts.* In the case at bar, as in *Betts* and *White,* the jury was properly instructed on all applicable degrees of homicide and was given MAI–CR2d 2.14. Defendant's third point has no merit.

 Defendant's fourth point is that the trial court erred in failing to give MAI–CR2d 2.50: Character of Defendant Bearing on Guilt or Innocence, for the reason that defendant adduced substantial evidence of his good character.

Cases construing § 546.070(4), dealing with instructions on "good character," hold that MAI–CR2d 2.50 need not be given unless there is substantial evidence of the defendant's good character. *State v. Moore,* 303 S.W.2d 60, 70[14] (Mo. banc 1957); *State v. Woodfin,* 559 S.W.2d 273, 277 (Mo.App.1977); *State v. Underwood,* 530 S.W.2d 261, 262[1] (Mo.App.1975). The failure to give the instruction was held to be reversible error where three witnesses in a robbery case testified defendant had a reputation for being honest, *State v. Wells,* 586 S.W.2d 354 (Mo.App.1979), where the evidence in a murder case showed defendant had a reputation as a "peaceful law-abiding citizen," *State v. Antwine,* 506 S.W.2d 397 (Mo.1974), and where evidence in a case involving the unlawful sale of beer was that defendant's reputation was good for "honesty and being an upright citizen," *State v. Woods,* 428 S.W.2d 521 (Mo.1968). On the other hand, evidence that defendant had a reputation as a "good person" did not require the giving of the instruction, at least as a matter of "plain error." *State v. Woodfin,* supra.

MAI–CR2d 2.50 reads, in part: "Evidence has been introduced concerning the reputation of defendant as to *those traits of character which ordinarily would be involved in the commission of an offense such as that charged in this case.* This evidence was received because a jury may reason that a person of good character as to *such traits* would not be likely to commit the offense charged against the defendant. . . ." (Emphasis added.)

Defendant's claim of error in the instant case hinges solely upon the use of one word in a leading question propounded by his counsel to one of five defense witnesses,

Anderson, Ichord, Dye, Thompson and Bales, who testified briefly and in the order listed. Anderson, Ichord, Dye and Bales testified that defendant's reputation "for truthfulness and veracity," "for being a truthful person," and "for truthfulness," was good. Such testimony, dealing with truthfulness and veracity only, does not require the giving of MAI–CR2d 2.50. *State v. Williams,* 532 S.W.2d 826, 829[10] (Mo. App.1975). MAI–CR2d, Notes on Use, Note 2.

During the direct examination of Charles Thompson, the fourth of the five witnesses, the following occurred:

"Q. During the period of time that you resided in Waynesville, have you become acquainted with the reputation of Bob Scott for being a truthful and honorable individual?

A. Yes, sir. To the best of my knowledge, yes.

Q. Is it a good or a bad reputation?

A. It is good."

According to Webster's New Collegiate Dictionary the word "honorable" means "deserving of honor."[7] Taken in context, the use of that word in the leading question did not alone constitute "substantial evidence," as to "those traits of character which ordinarily would be involved" in the commission of capital murder. Defendant's fourth point has no merit.

The judgment is affirmed.

GREENE, C.J., and TITUS and PREWITT, JJ., concur.

---

**7.** Shakespeare devotees will recall that Mark Antony, over the daggered corpse of Caesar, said:

"For Brutus is an honorable man;
So are they all, all honorable men."
Julius Caesar III, ii, 88.