**STATE of Missouri, Respondent,**

**v.**

**Lloyd Leo ANDERSON, Appellant.**

No. 49339.

Supreme Court of Missouri,

En Banc.

Dec. 9, 1963.

Rehearing Denied Jan. 13, 1965.

Thomas F. Eagleton, Atty. Gen., George W. Draper, II, Asst. Atty. Gen., Jefferson City, for respondent.

James J. Rankin, St. Louis, for appellant.

DALTON, Judge.

Defendant was charged and convicted of murder in the first degree of one Thomas Grupe in the City of St. Louis and the jury assessed his punishment at death. Sections 559.010 and 559.030 RSMo 1959, V.A.M.S.

On May 18, 1961, one Paul Speckart owned and operated the Speckart Rexall Drug Company located at 4100 West Nat-

ural Bridge in the City of St. Louis, Missouri. About 9 p.m. on the date mentioned, he was alone in the store and was standing behind the prescription counter and to the left of the cash register. His mother and the delivery boy, Thomas Grupe, were out of the store making prescription deliveries. At that time a Negro man entered the store and asked for sulphathiazole. While Speckart was explaining to him the necessity of a physician's prescription two Negro men about 18 to 19 years of age entered the store. The taller of these two men was later identified as Clewiston Jones, and the shorter one was the defendant, Lloyd Leo Anderson. Jones and Anderson started around the counter toward Speckart and Speckart observed that they had sawed-off shotguns in their hands and were pointing these shotguns at him. Jones struck Speckart with the butt end of his shotgun and knocked Speckart to the floor. While on the floor, he was struck several times about his head and shoulders and then told to get up and open the cash register. Speckart opened the cash register and was then ordered to get back down on the floor, which he did. While on the floor, he observed that someone was taking the money out of the cash register, which register contained approximately $525. Some of this money belonged to Speckart and the balance to a money order company, but all was under his care, custody and control. The man then struck Speckart several more times and told him to get up. When he got up, he noticed that Thomas Grupe had returned from making his prescription deliveries and was being forced into the prescription room by defendant.

Later, Speckart and Thomas Grupe were taken to the basement of the store and made to lie on the floor, where Speckart and Grupe were both beaten with what seemed to be the stocks of the shotguns. Immediately thereafter, two shots rang out within fifteen seconds of each other. The first killed Thomas Grupe and the second shot went through Speckart's shoulder. The men then left and Speckart observed that Thomas Grupe was lying motionless on the floor and appeared to be dead.

Subsequently, Speckart was taken to De-Paul Hospital where he was treated for a laceration of his chin, a gunshot wound of his left shoulder, a laceration of his left wrist and a deep laceration on the back of his head.

When Mrs. Speckart and Thomas Grupe had returned from making the mentioned deliveries, Mrs. Speckart had remained briefly in her automobile when Thomas Grupe entered the store. While waiting, Mrs. Speckart saw three shabbily-dressed Negro men leave the store by the front door and run south, on the west side of the street. Mrs. Speckart then entered the store and learned what had happened.

The body of Thomas Grupe was removed from the basement of Speckart's Drug Store the same evening and taken to City Hospital No. 2, where Dr. Wesley Ball pronounced him dead from an apparent missile wound. The body was then taken to the city morgue, where Dr. Martin Glaser performed an autopsy on May 19, 1961, and observed a bullet wound of the chest which had resulted in a severe hemorrhage into the chest cavities causing death. Dr. Glaser also removed a bullet from just under the skin on the left side, the fifth intercostal space, a .32 caliber bullet, which was turned over to Donald Brocksmith, a St. Louis Police Officer, assigned to the police laboratory.

After the robbery and homicide, certain St. Louis police officers went to Speckart's Drug Store and recovered a .25 caliber cartridge casing from the floor in the center aisle of the basement and a spent pellet.

About 10:30 p.m. on May 29, 1961 two St. Louis Police Officers, Henry Lachenicht and Raymond Lauer, went to 1914 North Grand Avenue in the City of St. Louis. Lachenicht carried a twelve-guage shotgun and Lauer carried his service pistol. Both officers entered the premises and there found the defendant and Clewiston Jones.

Lachenicht ordered them to "throw out your guns and come out, we're police officers." Thereupon, Jones pointed a pistol at Lachenicht and fired approximately three shots at the officers. Lachenicht then shot and killed Jones. Defendant, however, dropped his revolver to the floor, threw up his hands and stated: "Don't shoot, I'm coming out, we're the men you're looking for. I killed the Grupe boy", and he surrendered to the officers. There was further evidence that, as Officer Lachenicht entered the premises through the front door, he saw defendant "running to the back of the building." When the officer exchanged shots with Jones, Jones was only fifteen feet away and Jones fell backward behind a "cooler." The officer then ordered defendant to come out and put his hands up in front of the "cooler," and defendant complied with the order.

The body of Clewiston Jones was immediately taken to City Hospital No. 2 and then to the city morgue, where it was viewed by Speckart. On the same evening Speckart also saw defendant at the police station and at the trial he identified Jones and defendant as two of the men who committed the robbery, and he also identified two sawed-off (double-barrel) shotguns and a pistol as resembling the weapons used in the holdup of Speckart's store by Clewiston Jones and the defendant.

After defendant's arrest on May 29, 1961, Daniel Reardon, Jr., Circuit Attorney for the City of St. Louis, questioned the defendant with reference to the Speckart Drug Store robbery and the killing of Thomas Grupe. In Reardon's presence, the defendant gave a statement which was reduced to writing, read and signed by defendant. In this statement the defendant stated in essence that about two weeks prior thereto he, Clewiston Jones and a third man robbed the Speckart Drug Store; that Clewiston Jones had a loaded .25 caliber automatic and a sawed-off shotgun and the defendant had a loaded .32 caliber revolver and a loaded sawed-off shotgun; that they obtained about three hundred dollars from the robbery; and that, while in the basement of the store, defendant fired one shot from his .32 caliber revolver at Thomas Grupe. Clewiston Jones fired one shot from a .25 caliber Colt semi-automatic pistol.

Defendant also stated that the .32 caliber Harrington and Richardson revolver he had used to shoot Thomas Grupe was then at Clewiston Jones' house at 6048 Maple in the City of St. Louis and so were the two sawed-off shotguns they had with them at the time. Defendant also stated that Jones had used a .25 caliber automatic pistol in the Speckart store robbery. Defendant in his statement, after the police had obtained possession of these weapons, identified the .32 Harrington and Richardson revolver as the revolver which was in his possession and which he fired at Thomas Grupe in the basement of Speckart's Drug Store. He also identified as his own one of the shotguns which he had with him at that time, because, as defendant stated, "it's busted on the handle."

The State's evidence further tended to show that about 1 a.m. on May 30, 1961, after defendant's confession and statement as to the then location of the guns used in the Speckart robbery, a St. Louis Police Officer, Elmer Kuhlman, had gone to 6048 Maple Avenue, the residence of Clewiston Jones, and had removed from the premises a Harrington and Richardson .32 caliber revolver, two "Belgin Russell Arms Company make double-barrel sawed-off shotguns," and a .25 Colt semi-automatic pistol. In addition, he found ammunition to fit all of these weapons.

Lieutenant Frank Ruff of the St. Louis Police Laboratory performed firearms identification tests on the various State's exhibits. The results of his tests showed that the bullet removed from the body of Thomas Grupe by Dr. Glaser was fired from the .32 Harrington and Richardson revolver; and that the spent pellet found on the basement floor of Speckart's Drug Store was

fired from the .25 caliber semi-automatic pistol in question.

When Lieutenant Ruff first attempted to fire the .32 caliber Harrington and Richardson revolver he was unable to do so because of its faulty mechanism. However, he talked to the defendant who advised him that, although he knew the revolver was in a broken condition, it could be fired in its then condition. Ruff handed the weapon to the defendant who demonstrated to Ruff how to fire the revolver. Ruff then returned to the laboratory and, by using the manner described by defendant, he was able to test shoot the revolver with the result as above stated.

No evidence was offered on behalf of defendant.

█ Defendant, represented by counsel at the trial and on this appeal, does not challenge the sufficiency of the evidence to support the verdict; however, we find it entirely sufficient to make out a submissible case of murder in the first degree as charged.

The first assignment in appellant's brief is that, "The trial Court erred in failing to declare a mistrial at the request of appellant in that testimony of various prosecution witnesses, over the objection of appellant, was introduced and admitted into evidence *which proved the commission of a separate and distinct crime from that with which appellant was charged,* thus allowing in highly prejudicial evidence and depriving appellant of a fair trial and violates appellant's right to be tried for the offense for which he was indicted." (Italics ours.)

██ Appellant's theory is that the trial court committed reversible error in refusing to declare a mistrial on the ground that testimony was admitted over objection tending to show *that on May 29, 1961 appellant was arrested in the course of a robbery of the 905 Liquor Store located at 1914 Grand Avenue.* Appellant in support of this assignment of error cites State v. Reese, 364

Mo. 1221, 274 S.W.2d 304; State v. Lyle, 125 S.C. 406, 118 S.E. 803; State v. Mosier, Mo.Sup., 102 S.W.2d 620; State v. Buxton, 324 Mo. 78, 22 S.W.2d 635. These cases support the rule relied upon by appellant, but the facts shown by the record do not call for the application of the rule, because there was no testimony admitted in evidence or shown by the record from which the jury could find the commission of any other separate and distinct crime from that charged against the defendant by the indictment (nor were the particulars with reference to any such other crime shown) except that of robbery in the first degree with a dangerous and deadly weapon and of resisting arrest, proof of which crimes appellant does not make complaint. The evidence as to robbery in the first degree of Paul Speckart was admissible (1) because Section 559.010 RSMo 1959, V.A.M.S. provides that: "every homicide which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or mayhem, shall be deemed murder in the first degree"; and (2) because evidence that a person accused of an offense resisted arrest is generally relevant, even though such evidence discloses that the separate crime of resisting arrest has been committed. Such evidence was properly admitted in this case. State v. Garner, 360 Mo. 50, 226 S.W.2d 604, 609 [7]; State v. Ball, Mo.Sup., 339 S.W.2d 783, 784 [2]; State v. Wilkins, Mo.Sup., 100 S.W.2d 889, 895; 22A C.J.S. Criminal Law § 628, pp. 474–477. Further, the charge of murder was submitted to the jury under both parts of Section 559.010, that is, "as a wilful, deliberate and premeditated killing" and also as a "killing committed in the perpetration of a robbery", and we have seen that much of the testimony in the record is devoted to proof of robbery in the first degree.

It will not be necessary to review the rule relied upon by appellant with reference to the exclusion of evidence of separate and distinct crimes, or the exceptions to the rule, because no testimony was offered or received in evidence tending to show that ap-

pellant was arrested May 29, 1961, "in the course of a robbery", or that 1914 North Grand Avenue was a business place, or that a robbery was in progress there, or that a liquor store was there located, or that it was the "905 Liquor Store", or that any store was located at 1914 North Grand Avenue. The record relied upon by appellant is wholly insufficient to support the conclusions sought to be drawn therefrom. We do not find a single statement in the testimony tending to show what action, if any, the appellant and Clewiston Jones were engaged in at 1914 North Grand Avenue or how or why they happened to be there or how the officers may have known they were there, if they did, immediately prior to the appearance of the officers who sought to arrest defendant and Jones.

In support of this assignment of error appellant has referred to numerous pages of the transcript of the record. A review of these page references shows that most of the pages referred to contain extended statements, objections and conclusions by appellant's counsel, but no testimony subject to the objections made.

A careful check of the testimony admitted and shown on the pages of the transcript referred to in appellant's brief in support of his first assignment of error discloses that the most that could be inferred from the way the officers carried their firearms when they entered the premises at 1914 North Grand Avenue was that they were expecting trouble from someone and were prepared for it.

As stated, much of the evidence before the jury was directed to proof of the facts connected with the robbery of Paul Speckart, owner of the Speckart Drug Store. The witness frequently referred to the occurrence as a "robbery" or "holdup" and not as a homicide or murder, although the evidence, as stated, showed a homicide in the perpetration of a robbery and the indictment charged murder in the first degree.

For example, Mr. Paul Speckart testified that subsequent to the robbery he first saw the taller of the two young men at the morgue about two weeks "after the holdup." He also testified that after the men had left the store he pressed the buzzer for his father, who came to the head of the stairs above the store, and witness told him "we had been held up." When asked about one of the State's exhibits and asked whether or not he had seen the particular object or one similar to it, he answered "Yes, I saw it at the holdup in the hands of one of the holdup men." Still later in his testimony, when he was asked where he first saw the defendant after the occurrence and after he (Speckart) was out of the hospital, he said, "I saw him at police headquarters, I'm not sure of the exact date, but he was there, *after he was brought in on a holdup charge.*" (Italics ours.) This answer is the particular statement that appellant relies upon to show proof of another separate and distinct crime other than the one for which the defendant was being tried. In counsel's objections to this testimony he insisted that the reference was to "another holdup" and not connected with the offense for which defendant was on trial. The only relief asked was for the court to declare a mistrial, which was denied by the court.

The next statement of counsel after the above answer was given was, "Now, don't tell us anything about—", whereupon defendant's counsel stated: "I have no choice but to ask for a mistrial in view of that response, too it was not responsive to the question Mr. Fredericks asked * * *." After further objection and discussion out of the hearing of the jury the court said: "Well, I don't think it's sufficiently prejudicial for a mistrial. Motion for a mistrial is denied." Appellant says that this ruling indicated that the court thought the reference was to "another holdup." But, if the court ruled correctly, as we think it did, it is immaterial that the court may have assigned an erroneous reason for its action. Missouri Electric Power Co. v. City of Mountain Grove, 352 Mo. 262, 176 S.W.2d 612, 616 [10]. No request was made to strike the voluntary statement, which was not called

for by the question, nor was the court asked to direct the jury to disregard that part of the answer.

Thereafter, the examination of the witness was continued, as follows:

"Q How much money was taken during the course of *this robbery* on the 18th of May, 1961?

"A Approximately $525.00." (Italics ours.)

Thereafter, another witness testified that State's Exhibit 1 showed "the scene surrounding the area of *the holdup at Fair and Natural Bridge*" on May 18, 1961. (Italics ours.) Other witnesses also referred to the occurrence at the Speckart Drug Store on May 18, 1961, as a "shooting" or as a "holdup." For instance, Corporal Edward Unnerstall, a police officer, testified that on or about May 29, 1961, he had an occasion to see the defendant at "1900 North Grand" and that he took the defendant to City Hospital No. 2 (Homer G. Phillips Hospital), since defendant was claiming to be sick. As to what happened after he left the hospital with defendant, he testified, as follows:

"Q After you left the hospital, did you have any discussions with this Defendant?

"A Yes, sir.

"Q Will you tell us what you discussed, if anything, with this Defendant pertaining to the Speckart Drug Store *holdup* and the killing of Thomas Grupe?

"A We asked him if he had anything to do with the *shooting* over at the Speckart Drug Store and he said 'yes.'

"Q What other conversation pertaining to *that* went on between you and the Defendant Anderson at that time?

"A Well, he told us that he was implicated in *that holdup* over there and that he did some of the *shooting over there.* We asked him where the car was and he told us where the car was parked." (Italics ours.)

At this time defendant's counsel made the following statement, apparently in the presence of the jury, since the record does not show it was out of the presence of the jury, although the record subsequently shows that the trial was resumed before the jury.

"MR. RANKIN: I'd like to ask that a mistrial be declared at this time, Your Honor, because this officer is now referring to a holdup at the 905 Liquor Store on North Grand and I think the jury can certainly understand what he is talking about.

"THE COURT: I don't so interpret that."

The examination of the witness then continued, as follows:

"Q Now, I believe you have testified there was some conversation between yourself and the Defendant Anderson with reference to the *shooting* at the Speckart Drug Store on May 18, 1961?

"A Yes, sir.

"Q Then you said something about an automobile, now what did the Defendant say about an automobile at that time?

"A We asked him where he parked the automobile and he said he parked it on Spring Avenue near North Market.

"Q With reference to that car, *to that automobile*, did he say anything about *that automobile being used in the holdup and killing of the Grupe boy*?

"A He said it was the same car.

"Q *Did he then give you directions to get to the car to where it was parked at that time*?

"A Yes, sir.

"Q What did you do at that time?

"A We went over to the car and there was a lady sitting in it.

"Q What kind of a car was that?

"A A '54 or '55 black Ford.

"Q   With reference to the young lady sitting in the car, did you apprehend her?

"A   Yes, sir.

\* \* \* \* \*

"Q   Officer, what was the name of the woman sitting in the car?

"A   Doris Jones.

"Q   Is she the wife of Clewiston Jones?

"A   She stated that she was." (Italics ours.)

■ Appellant also contends this and other evidence in the record, erroneously admitted over objection, proved the commission of a separate and distinct crime, to wit, robbery of the 905 Liquor Store on North Grand Avenue. We think the evidence insufficient for that purpose and so hold.

As has been stated, we find no testimony in the record from which a jury could have found that defendant was arrested "in the course of a robbery of the 905 Liquor Store located at 1914 Grand Avenue", as claimed by appellant. Further, the fact that defendant directed the officer to the location of the automobile used by defendant and Clewiston Jones in the robbery of Paul Speckart at the drug store, and the finding of Clewiston Jones' wife seated therein, did not prove the commission of a separate or distinct crime by defendant on May 29, 1961, nor did the evidence, with reference to the gun battle between Clewiston Jones, defendant and the police officers, erroneously show the commission of, or the particulars with reference to, any separate and distinct crime other than that charged against defendant, except the offense of resisting arrest and robbery of May 18 of which appellant does not and may not complain. We must and do further hold that the testimony of Paul Speckart that he saw defendant at police headquarters some two weeks after the robbery, when defendant "was brought in on a holdup charge" did not constitute "proof of another holdup"

nor prove the commission of a separate and distinct crime, so as to constitute error.

■ Further, the declaring of a mistrial for conduct of a witness or spectator in the course of a trial lies largely within the discretion of the trial judge and this is particularly true where a voluntary statement is made by a witness. State v. Statler, Mo.Sup., 331 S.W.2d 526, 531; State v. Baker, Mo.Sup., 293 S.W.2d 900, 902 [1]; State v. Egan, Mo.App., 272 S.W.2d 719, 727 [18–20]; State v. James, Mo.Sup., 347 S.W.2d 211, 214 [7–10]. The court did not err in refusing to declare a mistrial.

Appellant's final assignment under points and authorities is that, "the trial court erred in failing to discharge jurors Gruber and Hogue and substituting the alternate juror, and, after refusing to substitute or discharge, in failing to declare a mistrial, thereby depriving the appellant of his right to peremptory challenges and depriving the appellant of a fair trial." Appellant reviews the facts upon which this assignment of error is based substantially as follows: "At one point in the trial, one of the jurors, Gruber, who subsequently became foreman of the jury informed the Court that he knew the witness, officer Lachenicht, who had just been called. \* \* \* The Court informed counsel of this matter and appellant's counsel moved for a mistrial, and objected that this deprived defendant of exercising his peremptory challenge and the right to interrogate the juror [as to what influence the witness might have over the jurors]. Thereafter, Juror Gruber was examined in chambers. Appellant's counsel then asked that the juror be excused and that the alternate juror be substituted." All requests were denied by the Court.

"Thereafter, the court informed counsel that juror Hogue had told the bailiff he knew one of the police officers who had been in the courtroom. The officer's name was determined to be Robert Hawkins, who later testified for the State. Thereafter, an examination of juror Hogue was con-

ducted. After the examination the defendant again moved for a mistrial, for the substitution of the alternate juror, and that the Court excuse juror Hogue. These motions * * * were overruled by the Court and the trial progressed with jurors Gruber and Hogue continuing to sit as jurors."

In addition to the facts stated by appellant, the record shows that Juror Gruber, when examined out of the presence of the jury, said: "I know this officer [Henry Lachenicht] very slightly, I have seen him bowling and I didn't recognize his name * * * I thought it was Habenicht * * * or something like that. * * * I bowled with him one year, but he wasn't a personal friend. * * * He was on a different team in the same league, * * * and was * * * maybe twenty times that year in the same building [as the juror]." The juror stated that because of his acquaintance with the man he would not give the officer's testimony any more weight than any other witness in the case; and that his acquaintance with the witness didn't matter to him in the slightest.

Appellant's counsel again asked a mistrial on the ground that he was deprived of making a peremptory challenge; however, the further voir dire examination of Juror Gruber developed no disqualification on the part of the juror.

When the further voir dire examination of Juror Hogue was conducted outside of the hearing of the other jurors, it developed that Officer Hawkins, who had been called as a State's witness, was in the same National Guard organization with the juror, and the organization met once a week. The juror testified: "I didn't know his name, I'd just seen him down there and I didn't even know he was a police officer * * * I just know him by seeing him and that's all." The officer was in a different unit, since the juror was "in transportation" and the mentioned officer was "in construction or headquarters." The juror had no dealings with him at all. He had had no conversations with the officer. "It was over a year since I saw the man, I didn't even know his name, or his occupation, or anything." Defendant's counsel again asked a mistrial since he would be denied his peremptory challenges. Counsel also asked that Juror Hogue be excused and the alternate, Juror Babinsky, be substituted in his place. The requests were denied.

The transcript on file fails to show that either of these jurors had been asked on the original voir dire examination concerning their knowledge of or acquaintance with any of the State's witnesses. The record upon which this cause was submitted does not show any part of the original voir dire examination of these jurors. The argument in appellant's brief with reference to this assignment is to the effect that the appellant was entitled to the peremptory challenges allowed by statute. Section 546.-180 RSMo 1959, V.A.M.S. These challenges were no doubt made. Appellant further argues that a juror who knows one of the principal witnesses and gives complete credence to the testimony of the witness is highly prejudicial to the defendant; that this type of witness would be stricken from the panel by a defendant, if given the opportunity; and that when a defendant has been denied this opportunity, he has been deprived of his statutory right, and he has been deprived of a trial by a fair and impartial jury. Appellant merely assumes, without proof, that the jurors, because of such casual acquaintance, will give full and complete credence to the testimony of the mentioned witnesses. Appellant concedes that "the problem arose through no ones fault", but that "through the course of events in the trial of this cause the appellant was deprived of his statutory right."

To properly support this assignment, the record should affirmatively show that these jurors were specifically questioned on voir dire examination with reference to their knowledge or acquaintance with these witnesses. The record merely shows that the voir dire examination of the jury was started at 11:15 a.m. on September 25, 1961, and was concluded at 6 p.m. What exam-

ination of the jurors was made by defendant's counsel does not appear.

■ Appellant, in effect, concedes that there was no intentional concealment by the jurors of any fact affecting their qualifications as jurors and the good faith of the jurors is not questioned. As stated, no facts tending to disqualify either juror were developed on the subsequent voir dire examination of the two jurors by the court or by counsel for defendant when conducted in the Judge's chambers after the question arose. The action taken by the trial court in denying the various requests was not error, since the matter was within the sound discretion of the trial court and no abuse of that discretion appears from the record. State v. Harris, Mo.Sup., 356 S.W. 2d 889, 890[2]; Zein v. Pickel Stone Co., Mo.App., 273 S.W. 165, 168 [9]; Vojta v. Pelikan, 15 Mo.App., 471, 478; Harrison v. St. Louis Public Service Co., Mo.App., 251 S.W.2d 348, 351 [3, 4]; Hampy v. Midwest Hanger Co., Mo.App., 355 S.W.2d 415, 421 [7]. The casual acquaintance of these jurors with the mentioned witnesses and the fact that they identified them on sight, but were not sufficiently acquainted to even know their true names, fails to show that defendant was prejudiced in any manner. Further, in some sections of the state it would not be unusual for every member of the jury panel to be acquainted with every person appearing as a witness. Such casual acquaintance is not in and of itself a disqualification of a juror.

■ Appellant's insistence that the facts in question have deprived him of a fair and impartial trial are not sustained by the record. The statements and complaints do not prove themselves and they cannot be considered unless substantiated by the record. State v. Childers, Mo.Sup., 313 S.W.2d 728, 731 [3, 4]. The record presented does not sustain the allegation of error and it is overruled.

No assignments of error have been directed to those matters required to be reviewed under Supreme Court Rule 28.02, V.A.M.R., and not required to be preserved in a motion for a new trial; however, we have examined the record as to these matters and no reversible error appears.

The judgment is affirmed

All concur.