STATE of Missouri, Respondent,

v.

Thomas Henry BATTLE, Appellant.

No. 63436.

Supreme Court of Missouri,
En Banc.

Nov. 22, 1983.

Rehearing Denied Dec. 20, 1983.

Mark S. Fredman, St. Louis, for appellant.

John Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

BILLINGS, Judge.

Defendant Thomas Henry Battle was convicted and sentenced to death for the capital murder of an 80-year-old woman. He contends the death sentence violates the Missouri Constitution, his inculpatory statements were unconstitutionally tainted and improperly admitted at trial, the trial court erred in the jury selection process and instructions to the jury, the trial court should have declared a "hung jury" during the penalty phase of the trial, and, lastly, the death sentence should be set aside because it was imposed under the influence of passion and is excessive and disproportionate. We affirm.

Miss Birdie Johnson, 80, lived alone in her St. Louis ground floor apartment. Defendant, 18-years-old at the time of the murder, lived with his parents in a nearby apartment. From time to time defendant, called "Sweetboy" by Miss Johnson, had performed odd jobs for the elderly lady.

About 2:30 or 3:00 a.m. of July 5, 1980, defendant and Tracy Rowan were in de-

fendant's bedroom "drinking a couple of beers and getting high." Defendant suggested they burglarize Miss Johnson's apartment. They walked over to the targeted apartment and gained entry by climbing atop a fence, ripping the screen from an open kitchen window, and climbing through the window. Defendant led the way and as he went through the kitchen he picked up a twelve-inch butcher knife.

There was substantial evidence from which the jury could find that defendant and his companion raped Miss Johnson, that she was brutally beaten, and the apartment was ransacked for money and valuables. When Rowan turned on a light, defendant announced, in Miss Johnson's presence, that she would have to die because she had seen them. Defendant commenced stabbing the elderly, naked, beaten and ravished woman with the butcher knife. Because the knife kept bending, defendant finally plunged the blade into Miss Johnson's face, just under her left eye. She was still alive, with the knife protruding from her face, "talking and saying short prayers", when defendant and Rowan exited the apartment by way of the kitchen window.

Sometime between 3:00 and 4:00 a.m., Miss Johnson's upstairs neighbor was awakened by knocking sounds coming from downstairs. The neighbor went down to Miss Johnson's apartment and when she heard Miss Johnson calling, broke the front door and entered. The bleeding, aged victim was sitting naked on the floor, with the butcher knife sticking out of her eye socket. Police and an ambulance were called. Miss Johnson was awake and alert but suffering from shock when she was taken to a hospital. She died at 5:45 a.m. Death was attributed to a combination of the following injuries: severe trauma and bruising of her head, resulting in cranial hemorrhaging; multiple bruises and contusions to her face and body; multiple incisions and lacerations to her chest and back from the knife; eight rib fractures; multiple lacerations of the lung; an injury to the brain from the facial

stab wound; shock caused by extreme loss of blood and pooling of two-thirds of the body's total blood supply in the right chest cavity.

■ We have previously rejected defendant's contention that the death sentence violates the "natural right to life" provision as expressed in Art. I, § 2, Mo. Const. *State v. Williams,* 652 S.W.2d 102 (Mo. banc 1983); *State v. Bolder,* 635 S.W.2d 673 (Mo. banc), *cert. denied,* —— U.S. ——, 103 S.Ct. 770, 74 L.Ed.2d 983 (1982); *State v. Newlon,* 627 S.W.2d 606 (Mo. banc), *cert. denied,* —— U.S. ——, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982). The point is denied.

Defendant avers the admissions and incriminating statements he made on a cassette tape recording and video tape should have been suppressed by the trial court because they resulted from violations by the police of the constitutional guarantees found in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Further, considering the totality of the circumstances, his admissions and confessions of guilt were coerced and rendered involuntary.

The trial court conducted a lengthy evidentiary hearing on defendant's motion to suppress his incriminating statements.[1] Defendant, in response to leading questions by his attorney, testified that before the cassette and video tape statements were made that he asked the interrogating officers if he had to answer questions and if he could see a lawyer, but the officers ignored his inquiries and continued to question him and make the tapes.

The State's evidence at the suppression hearing was as follows: During the course of the investigation of the murder of Miss Johnson the police received information that a person named Elroy Preston might have been involved. Preston was picked up July 15, 1980, and told officers he, defendant, and Tracy Rowan had been out drinking at the time of the murder. To check

---

1. Defendant's motion to suppress was also directed to statements made prior to the tapings and a statement made the next day. The trial court ordered these statements suppressed.

Preston's alibi, officers attempted to locate defendant the same day. Defendant was not at home and the officers left a message with his parents for him to call them. Later in the day, defendant telephoned one of the officers and told him he was willing to cooperate and would talk to them the next morning if someone could pick him up.

Between 9:30 and 10:00 a.m. the next morning, July 16, Detective Scaggs drove by defendant's home and picked him up. At about 10:30 a.m., Sergeant Riley, Detective Scaggs and two other officers began interviewing defendant in the homicide office.[2] The officers testified that at this time defendant was not a suspect in the murder and was not under arrest. As the officers talked with defendant about Preston's story, he became visibly nervous—fidgeting and twisting a small towel he had with him. About fifteen minutes after the interview commenced, defendant leaned back in his chair with his legs outstretched. Sergeant Riley noticed that the tread pattern on defendant's tennis shoes looked like a shoeprint found at the murder scene, a photograph of which Sergeant Riley had before him. Riley halted the interview and advised defendant of his *Miranda* rights. Defendant waived those rights and signed a written consent to be fingerprinted and voluntarily surrendered his tennis shoes.

Approximately an hour after the fingerprinting process had been completed, defendant was returned to the homicide room where Riley told him, correctly, that his palm print and shoes had been found to match a palm print and shoe print discovered in Miss Johnson's apartment after the murder. Defendant at first denied any participation in the murder and claimed he had not been in the victim's house since the

previous winter. Shortly thereafter, defendant said: "Man, I've got to tell the truth about this thing." He agreed to make a tape recorded statement. He was given a written *Miranda* waiver form which he read, initialed each warning, and signed at 12:35 p.m. At the beginning of the taped statement he was again advised of his *Miranda* rights and again waived these rights. He admitted he and Rowan had broken into Miss Johnson's apartment but stated the murder was committed by his companion without his knowledge or participation. Noting defendant's account of what happened was inconsistent and at times incredible, Sergeant Riley challenged the story in various aspects. When the tape was stopped to change sides, Sergeant Riley told defendant: "You've been a man up to this point. Why don't you be a real man and tell exactly what went down." Defendant agreed to do so and he then confessed to the murder of Miss Johnson.

After the cassette tape statement had been completed, the officers asked defendant if he would give his statement on video tape. He agreed. Enroute to the video taping studio, defendant was given and ate two sandwiches and drank a soft drink. The video tape commenced at 2:17 p.m. Again, defendant was given and waived his *Miranda* rights. He repeated his admission that he murdered Miss Johnson.

The officers testified that at no time was defendant threatened, coerced or made any promises regarding his statements. By the time the video tape was completed the defendant had been given and waived his *Miranda* rights four different times[3] and made no request for an attorney at any time.[4]

---

2. Departmental policy prohibits the interviewing of a person by a single officer.

3. The following morning, July 17, Rowan, who was in custody, requested investigating officers to come to his cell. After speaking to Rowan, the officers approached defendant's cell to see if he would clarify certain details. Before the officers said anything, defendant told them: "I made a long distance call to God last night . . . and I want to get this thing straight." He again admitted the murder. He was taken back to

the homicide room and made further statements regarding details of the crime. The officers' testimony was conflicting as to whether defendant was again *Miranda*-ized before this statement. In any event, the trial court suppressed defendant's statements of July 17.

4. Defendant testified at trial. At no point in his examination did he testify that he asked the officers if he had to answer their questions or asked the officers if he could see or talk to a lawyer before making the tapes. He denied

In our review of the trial court's determination of defendant's motion to suppress the cassette tape and video tape, the weight of the evidence and *credibility* of the witnesses are questions for the trial court's resolution and we are not confined to defendant's version of the facts. Furthermore, we are not to disturb the rulings of the trial court where it is supported by substantial evidence. *State v. Boggs,* 634 S.W.2d 447, 453 (Mo. banc 1982); *State v. Baker,* 636 S.W.2d 902 (Mo. banc 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983).

■ On the record in this case we find no error in the admission of the cassette tape and video tape. The testimony of the officers, the execution of the waiver warning form, the transcripts of both tapes, and defendant's trial testimony clearly show he was given multiple *Miranda* warnings and repeatedly waived them. On defendant's second prong of attack, that the totality of the circumstances demonstrate coercion, there is substantial evidence to negate this charge. Defendant had completed the eighth grade in school, was no stranger to police questioning, was not denied food, and not threatened or made any promises before making the taped statements. We are of the opinion that the State carried its burden of proving the voluntariness of the defendant's incriminating statements by a preponderance of the evidence [*State v. Flowers,* 592 S.W.2d 167 (Mo. banc 1979)] and the trial court did not abuse its discretion in ruling them voluntary. *See, State v. Flenoid,* 642 S.W.2d 631 (Mo. banc 1982).

■ Defendant assigns as error the trial court's striking for cause venireman Fannon, suggesting such action violates the rule of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). We recognize that *Witherspoon* holds that potential jurors cannot be excused for cause merely on the basis of general objections to or religious scruples regarding capital punishment but are of the opinion that defendant's contention overlooks that part of *Witherspoon* that declares veniremen must be willing to *consider* all of the penalties provided by law and not be irrevocably committed to vote against the death penalty regardless of the facts and circumstances that might be presented at trial. 391 U.S. at 521–22 n. 20, 88 S.Ct. at 1776–77 n. 20.

We have carefully examined the entire examination of venireman Fannon—by the prosecutor, the defense attorney, and the court. He stated that because of religious beliefs he could not sit in judgment of another man and could never impose the death penalty in any case, regardless of the circumstances. When he equivocated to some extent in voir dire by defendant's attorney, the trial judge asked:

*Court:* " . . . [A]re you saying that in no case would you ever consider the death penalty, would you be able to consider it? Are you saying that or are you not saying that?

*Fannon:* Yeah. I don't think I would. I mean—

*Court:* There's no case, there's no case in which you would ever consider imposing the death penalty, is that what you're saying?

*Fannon:* Yeah.

Viewing the testimony of venireman Fannon *as a whole,* we do not find the trial court abused its broad discretion in concluding this prospective juror would automatically vote against capital punishment regardless of the evidence. *State v. Stokes,* 638 S.W.2d 715, 722 (Mo. banc 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1263, 75 L.Ed.2d 488 (1983); *State v. Garrett,* 627 S.W.2d 635, 642 (Mo. banc), *cert. denied,* —— U.S. ——, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982).

■ Defendant also argues that "Witherspooning" the jury panel and the resulting excusal of seven veniremen who categorically refused to consider the death sentence as a punishment alternative, violated his

murdering Miss Johnson. He said he, Rowan and Preston entered the apartment but that he left when Miss Johnson awakened. He also testified that Rowan told him Preston killed Miss Johnson and Preston told him that Rowan killed her.

right to trial by a jury selected from a fair cross-section of the community, citing *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), and *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). This identical point has been previously raised and ruled adversely to defendant. *State v. Blair,* 638 S.W.2d 739 (Mo. banc 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983), and cases cited at 752. The point is denied.

■ Defendant asserts that the aggravating circumstance found by the jury, that the murder of Miss Johnson "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind" [§ 565.012.2(7), RSMo 1978 Supp.] is unconstitutionally vague. Similar assignments have been expressly considered and rejected by this Court. *State v. LaRette,* 648 S.W.2d 96, 102 (Mo. banc 1983); *State v. Newlon,* 627 S.W.2d 606, 621–23 (Mo. banc), *cert. denied,* —— U.S. ——, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982).

■ Defendant next contends the trial court erred in refusing his tendered instruction in the penalty phase which listed all of the seven statutory mitigating circumstances found in § 565.012.3, RSMo 1980 Supp. The court ruled that three of the mitigating circumstances [5] were not supported by the evidence in the case. Defendant then tendered an amended version of MAI–CR2d 15.44 instruction which omitted the three paragraphs and the court gave the same. We find no evidence in the record to support the three stricken mitigating circumstances.

After additional evidence and argument at the punishment stage of the trial, the jury retired to consider the matter of punishment at 5:40 p.m. They were given three forms of verdict: a sentence of death, a sentence of life imprisonment, and one stating they were unable to agree upon punishment. Less than two hours later counsel for defendant requested that a "hung jury" be declared by the court and defendant sentenced to life imprisonment. The trial judge denied the request but agreed to call the jury into the courtroom and inquire if further deliberations would be helpful in reaching a verdict as to punishment. The judge indicated that if a majority of the jurors indicated more deliberation would not be helpful, he would declare a "hung jury" on the issue of punishment. The jury was brought in and by a show of hands all of them agreed further deliberations would be helpful. The court at that point offered the jury the choice of returning to the jury room or recessing for dinner and by a show of hands they elected to resume deliberations. The court denied defendant's second request for a mistrial on the issue of punishment forty-five minutes later and a third request at 9:00 p.m. The verdict of death was returned at 9:30 p.m.

Defendant argues that the time consumed by the jury in arriving at the death sentence was "unreasonable" and directs our attention to § 565.006.2, RSMo 1980 Supp., which, *inter alia,* provides that "If the jury cannot, within a reasonable time, agree to the punishment, the judge shall impose sentence within the limits of the law ...."

■ We think it is clear that the foregoing statute vests considerable discretion in the trial court, and in our view properly so. In considering the punishment to be meted out in this capital murder case the jury had been instructed they could consider all of the evidence which had been offered in a trial which had consumed five days and three nights. We have recognized that even in non-capital cases the length of time that a jury should be permitted to deliberate is a matter very largely within the

---

**5.** 2. Whether the murder of Birdie Johnson was committed while the defendant was under the influence of extreme mental or emotional disturbance.

3. Whether Birdie Johnson was a participant in the defendant's conduct or consented to the act.

6. Whether the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

discretion of the trial court. *State v. Covington,* 432 S.W.2d 267, 271–72 (Mo.1968). We find no abuse of discretion in this case.

Defendant's double-barreled assault on the imposition of the death penalty is that the sentence was imposed under the influence of passion and excessive and disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Section 565.014, RSMo 1978, mandates that this Court review the imposition of the death penalty. Our review includes the entire record and transcript and a report prepared by the trial judge. We are obligated to consider the punishment as well as any errors enumerated by way of appeal [§ 565.014.2] and with regard to the sentence shall determine [§ 565.014.3]:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 565.012; and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Defendant's charge that the death sentence was the result of passion finds no support in the record. He contends that a photograph of Miss Johnson with the knife protruding from her head evoked an "emotional response" from the jurors and this, coupled with the amount of time they deliberated, "demonstrates that the sentence was 'imposed under the influence of passion.'"

First of all, the photograph was relevant evidence and as stated in *State v. Shaw,* 636 S.W.2d 667 (Mo. banc), *cert. denied,* —— U.S. ——, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982):

[I]t would be foreign to our concept of criminal jurisprudence to suggest that relevant evidence should be inadmissible merely because it tends to prejudice the defendant. *See State v. Wood,* 596 S.W.2d 394, 403 (Mo. banc), *cert. denied,* 449 U.S. 876, 101 S.Ct. 221, 66 L.Ed.2d 98 (1980). Any incriminating evidence is by definition prejudicial.

*Id.* at 672. The criticized photograph graphically demonstrates the heinous nature of the instant killing and not only corroborates and clarifys testimony of witnesses [*State v. Wallace,* 504 S.W.2d 67, 72 (Mo.1973), *cert. denied,* 419 U.S. 847, 95 S.Ct. 84, 42 L.Ed.2d 76 (1974)] but also bears on the defendant's intent and deliberation. *State v. Ford,* 585 S.W.2d 472, 474 (Mo. banc 1979). In the statutory report filed by the trial court, the judge answered "No" to the question "Was there any indication that the jury was influenced by passion, prejudice, or any other arbitrary factor when assessing punishment?" Our review of the entire record leads us to the same conclusion.

Defendant does not question the sufficiency of the evidence to support the jury's finding of the statutory circumstance that the murder of Miss Johnson was "outrageously or wantonly vile, horrible, or inhuman in that it involved torture or depravity of mind." Nevertheless, pursuant to the mandate of § 565.014.3(2), we find there is substantial evidence to support the jury's finding of the aggravating circumstance beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Defendant forcibly entered Miss Johnson's apartment for the announced purpose of committing burglary. Just inside, defendant armed himself with a twelve-inch butcher knife even though he knew the elderly occupant of the apartment lived alone. The 80-year-old victim was raped, beaten, and then repeatedly stabbed and the knife plunged into her face to carry out defendant's declaration that she had to be killed. Despite the brutal and horrendous attack on Miss Johnson she was still alive when defendant fled the apartment. Bleeding internally and externally from multiple wounds, the mortally wounded woman remained conscious until her death

several hours later. The testimony of lay and medical witnesses, together with trial exhibits, vividly demonstrate the savage and heinous killing of the aged and defenseless woman. The jury could well find that she had substantial time to contemplate her fate [*State v. Blair,* 638 S.W.2d 739 (Mo. banc 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983)] and her slaying was outrageously or wantonly vile, horrible or inhuman in that it involved torture or depravity of mind.

We turn now to defendant's final contention that the imposition of the death sentence in this case is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

■ Defendant refers us to capital murder cases in which the death penalty was waived by the State. Death-waived cases are not relevant in our proportionality review. *State v. Bolder,* 635 S.W.2d 673 (Mo. banc 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983); *State v. Mercer,* 618 S.W.2d 1 (Mo. banc), *cert. denied,* 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981). Neither are the cases cited by defendant in which the defendant was a mere accomplice or secondary participant in the killing. Contrary to a defendant's argument, we do not deem *State v. McIlvoy,* 629 S.W.2d 333 (Mo. banc 1982), to be applicable to this case. According to defendant's testimony he had completed the eighth grade in school. The trial judge's report shows defendant had completed the tenth grade. There is no evidence that he was a person of subnormal intelligence, had a history of alcohol abuse, or was a weakling and a follower as determined in *McIlvoy* in reducing the sentence in that case. The

record indicates that defendant was of normal intelligence; that it was defendant who formulated and initiated the plan to burglarize Miss Johnson's apartment; that it was defendant who decided that Miss Johnson must die and the active wielder of the murder weapon.

Defendant requested and received a psychiatric examination and then withdrew his notice of mental disease or defect rendering him unfit to proceed. Although the report was not included in the record filed with us, the trial judge's report shows he was not suffering from any mental disease or defect excluding responsibility at the time of the offense or at trial. In the report the trial judge made the following comment regarding the appropriateness of the death sentence in this case:

> I personally do not ever believe in the death penalty. The Supreme Court of the United States has ruled it constitutional. According to my understanding of the law, a jury would not be unreasonable in assessing such punishment under the facts of this case according to the present state of the law.

Defendant was 18 years and 4 months old at the time of the murder. According to the trial judge's report defendant had been committed to the Boonville Training School for Boys in 1978 for "Juvenile-Assault". Apparent minor offenses in 1979 and 1980 resulted in fines, according to the report.

In his argument on this point defendant lays heavy stress on defendant's age in seeking to avoid the death penalty.[6] Much of the argument calls into question the wisdom of the death penalty. The General Assembly of Missouri has resolved that question against defendant.[7] Throughout his argument defendant ignores the sub-

---

**6.** In Missouri, the age limit for juvenile court jurisdiction is 16. The defendant, 18 at the time of the murder and 19 at the time of trial, was an "adult". Section 211.021, RSMo 1978.

**7.** The legislatures in some states have enacted statutes prohibiting the death penalty sanction in cases involving youthful offenders. *See e.g.,* Cal.Penal Code § 190.5 (West Supp.1982) (defendant under 18 at time of offense); Conn. Gen.Stat.Ann. § 53(a)–46(a) (West Supp.1981)

(same). Absent such a statute, states are free to apply their death penalty statutes to young offenders, and even juvenile offenders who stand trial as adults, so long as such statutes comport with general eighth amendment standards. *See generally,* Note, The Death Penalty for Juveniles—A Constitutional Alternative, 7 J.Juv.Law 54 (1983). The imposition of the death penalty is not cruel and unusual punishment *per se* simply because the defendant is a minor at the time of the offense. *Eddings v.*

stantial evidence showing his callous indifference to the life of his 80-year-old victim.

█ We have reviewed the capital cases in which death and life imprisonment have been submitted to the jury under the law effective May 26, 1977, in which the jury agreed on punishment and which have been ruled on appeal.[8] Defendant's sentence of death for the murder of Miss Johnson is not excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant.

The judgment is affirmed.

RENDLEN, C.J., and WELLIVER, HIGGINS, GUNN and DONNELLY, JJ., concur.

BLACKMAR, J., concurs in part and dissents in part in separate opinion filed.

Execution date set for January 6, 1984.

BLACKMAR, Judge, concurring in part and dissenting in part.

I concur in all parts of the principal opinion relating to the affirmance of the convic-

---

tion. I believe, however, that the death sentence should be set aside. Section 565.-014.3(3), RSMo 1978, enjoins us to consider "the defendant" in determining whether the sentence of death is excessive or disproportionate. The present defendant was 18 years old at the time the offense was committed. The principal opinion observes that the legislature imposed no restriction on the age of a person who could be executed. This Court still has its reviewing responsibility and is obliged to substitute its decision for that of the jury, if its assessment of the statutory factors governing sentencing indicates that this action is appropriate.

The history of capital punishment in Missouri shows that persons who were under the age of 20 at the time of commission of the offense have seldom been sentenced to death, or executed.

Of the cases decided under the new capital punishment law which are appropriate for comparison, four involve offenders age 19 or younger. These are: *State v. Basker-*

---

*Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (defendant 16 at the time of the murder) (sentence reversed and remanded on the grounds that the trial court failed to consider all relevant mitigating circumstances). Our holding is consistent with other state court decisions which have recently affirmed the death penalty in cases involving offenders younger than Battle. *See, Ice v. State,* No. 81–SC–5–MR, Slip Op. (Ky., Feb. 16, 1983); *Tokman v. State,* 435 So.2d 664 (Miss. 1983) (defendant 17 at time of offense, 18 at trial). *See also, High v. Zant,* 250 Ga. 693, 300 S.E.2d 654 (1983) ("minor at the time of the offense").

**8.** *State v. Davis,* 653 S.W.2d 167 (Mo. banc 1983); *State v. Doyle Williams,* 652 S.W.2d 102 (Mo. banc 1983); *State v. Smith,* 649 S.W.2d 417 (Mo. banc 1983); *State v. LaRette,* 648 S.W.2d 96 (Mo. banc 1983); *State v. Blair,* 638 S.W.2d 739 (Mo. banc 1982), *cert. denied,* ── U.S. ──, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983); *State v. Trimble,* 638 S.W.2d 726 (Mo. banc 1982), *cert. denied,* ── U.S. ──, 103 S.Ct. 838, 74 L.Ed.2d 1031 (1983); *State v. Stokes,* 638 S.W.2d 715 (Mo. banc 1982), *cert. denied,* ── U.S. ──, 103 S.Ct. 1263, 75 L.Ed.2d 488 (1983); *State v. Baker,* 636 S.W.2d 902 (Mo. banc 1982), *cert. denied,* ── U.S. ──, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983);

*State v. Shaw,* 636 S.W.2d 667 (Mo. banc), *cert. denied,* ── U.S. ──, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982); *State v. Bolder,* 635 S.W.2d 673 (Mo. banc 1982), *cert. denied,* ── U.S. ──, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983); *State v. Engleman,* 634 S.W.2d 466 (Mo.1982); *State v. McIlvoy,* 629 S.W.2d 333 (Mo. banc 1982); *State v. Newlon,* 627 S.W.2d 606 (Mo. banc), *cert. denied,* ── U.S. ──, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982); *State v. Greathouse,* 627 S.W.2d 592 (Mo.1982); *State v. Bostic,* 625 S.W.2d 128 (Mo.1981); *State v. Thomas,* 625 S.W.2d 115 (Mo.1981); *State v. Emerson,* 623 S.W.2d 252 (Mo.1981); *State v. Turner,* 623 S.W.2d 4 (Mo. banc 1981); *State v. Jensen,* 621 S.W.2d 263 (Mo.1981); *State v. Mercer,* 618 S.W.2d 1 (Mo. banc), *cert. denied,* 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981); *State v. Baskerville,* 616 S.W.2d 839 (Mo.1981); *State v. Mitchell,* 611 S.W.2d 223 (Mo. banc 1981); *State v. Vicky Williams,* 611 S.W.2d 26 (Mo. banc 1981); *State v. Royal,* 610 S.W.2d 946 (Mo. banc 1981); *State v. Borden,* 605 S.W.2d 88 (Mo. banc 1980); *State v. Downs,* 593 S.W.2d 535 (Mo.1980); *State v. Ernest Williams,* 659 S.W.2d 309 (Mo.App.1983); *State v. Coleman,* 660 S.W.2d 201 (Mo.App.1983); *State v. Zeitvogel,* 655 S.W.2d 678 (Mo.App. 1983); *State v. Martin,* 651 S.W.2d 645 (Mo. App.1983); *State v. Scott,* 651 S.W.2d 199 (Mo. App.1983); and *State v. Salkil,* 649 S.W.2d 509 (Mo.App.1983).

*ville,* 616 S.W.2d 839 (Mo.1981); *State v. Greathouse,* 627 S.W.2d 592 (Mo.1982); *State v. Scott,* 651 S.W.2d 199 (Mo.App. 1983); and *State v. Blair,* 638 S.W.2d 739 (Mo. banc 1982). In the first three the jury declined to assess the death penalty.

*Baskerville* involved a triple murder in the course of a robbery. The defendant was 19 years of age at the time the offense was committed. The facts as set out in Judge Seiler's Concurring Opinion were shocking and included the wanton killing of one person to obtain a gun, of a second because she was a witness, and of a seven year old boy without apparent reason.

*Scott* involved a defendant aged 16 years. The facts bear a remarkable similarity to the present case, involving multiple stab wounds, with the additional fact that a second person, who did not die, was repeatedly stabbed.

*Greathouse* involved the use of an axe followed by multiple gunshots inflicted by a 17-year old boy against his uncle.

There is no precise formula for comparison of horrors, but I am unable to see that the offenses involved in those cases were any less shocking or repulsive than what is involved in the case now before us.

Only in *Blair* was the death sentence imposed on a teenaged offender. The 18-year old defendant in that case had already served a term in the penitentiary, and had another stretch in jail. He undertook to kill a witness to a rape charged against a fellow prisoner, for a cash payment of several thousand dollars, and stalked his victim for several days. The record presented elements of willfulness, deliberation, and killing for pure gain which are not found in the present cases.

History shows that 35 persons were executed in the Missouri gas chamber following state convictions, prior to the invalidation of the previous death penalty statutes pursuant to *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Only two of the 35 were under the age of 18 at the time of the offense. *See State v. Lyles,* 353 Mo. 930, 185 S.W.2d 642 (1945); and *State v. Anderson,* 386 S.W.2d 225 (Mo. banc 1963). Without lengthening this opinion by details it is sufficient to say that both cases involved willful killings incident to robbery, in which the defendants abused their victims prior to killing and also severely wounded other persons who might well have died.

One of the most aggravated murders in our history is that of Bobby Franks by Richard Loeb and Nathan Leopold. The victim was abducted and brutally murdered by use of a chisel, while a ransom note was in circulation and the kidnappers continued their efforts to collect the ransom knowing that he was dead. The defendants retained Clarence Darrow and entered pleas of guilty. Sentencing fell to Judge John R. Caverly, Chief Justice of the Criminal Court of Cook County, Illinois. The Judge paid little attention to Darrow's psychological arguments but nevertheless decided not to impose the death penalty, explaining his reasoning as follows: [1]

It would have been the path of least resistance to impose the extreme penalty of the law. In choosing imprisonment instead of death, the Court is moved chiefly by the consideration of the age of the defendants, boys of 18 and 19 years. It is not for the Court to say that he will not in any case enforce capital punishment as an alternative, but the Court believes that it is within his province to decline to impose the sentence of death on persons who are not of full age.

This determination appears to be in accordance with the progress of criminal law all over the world and with the dictates of enlightened humanity. More than that, it seems to be in accordance with the precedents hitherto observed in this state. The records of Illinois show only two cases of minors who were put to death by legal process—to which number

1. Chicago Tribune, Sept. 11, 1924, p. 2. *See also* 15 Journal of Criminal Law and Criminology, 393 (1925).

the Court does not feel inclined to make an addition.

Perhaps this view from a time when the death penalty was much more often imposed than it is now will furnish perspective. History tells us that Loeb was killed in a prison incident in the 1930's, while Leopold served many years. After he was released on parole, he led a useful life.

Based on the above comparisons I do not believe that the law requires the life of this young man. In so stating I do not minimize the enormity of his guilt or the horrible details of the offense, but do urge youth as a proper factor for consideration.

I do have reservations as to whether there is compliance with the standards of *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). The defendant apparently decided to kill the elderly victim after he and his companion had raped her, in order to prevent identification, but only the "outrageously vile" aggravated circumstance was submitted to the jury. I am not persuaded that the stab wounds were inflicted with torture in mind. The defendant rather set out to kill but found that his weapon was inadequate, except when a vital spot was located. But *Godfrey* has always seemed confusing to me and the Supreme Court appears to have retreated from it in recent years. I rather rest my conclusion on comparisons and on the age of the offender.

The defendant has argued the incongruity of allowing a death sentence to stand while his accomplice goes free through an acquittal. If this defendant is in fact executed, future generations will sense irony in the situation, but inconsistent verdicts are to be expected so long as we have individual determination of guilt with trial by jury and free severance, which are established parts of our criminal law and procedure. The incongruity may be corrected by the Governor, if so minded. The statute does not authorize the courts to afford mitigation on account of these circumstances. There is no basis for comparison of punishment when the jury determines that one

alleged participant was not guilty of any offense and cannot be punished at all.

The case should be remanded with directions to resentence the defendant to life imprisonment without probation or parole for 50 years.